**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 30 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LEE ANN BRYCE; SARA D. SMITH, The Reverend,

      Plaintiffs - Appellants,

    v.

EPISCOPAL CHURCH IN THE DIOCESE OF COLORADO; SAINT AIDAN'S EPISCOPAL CHURCH; THE RIGHT REVEREND WILLIAM JERRY WINTERROWD, in his official capacity and as an individual; THE REVEREND TINA ANDERSON, in her official capacity and as an individual; THE REVEREND DONALD HENDERSON, in his official capacity and as an individual; THE REVEREND NEYSA ELLGREN, in her official capacity and as an individual; and MEMBERS OF THE VESTRY OF SAINT AIDAN'S EPISCOPAL CHURCH, KARLA ALLEN, TRACY ENHOLM, DAVID HUFF, MARTI INGRAM, ED KASE, MARGIE MILLER, ANDY MORRIS, BAL PATTERSON, VIRGINIA PATTERSON, NORM PILGRIM, CAROL RASMUSSEN, CAROL STOTT, MARY WILDER, and RICHARD WOLNIEWICE, in their official capacities and as individuals,

      Defendants - Appellees,

THE ASSOCIATION OF CHRISTIAN SCHOOLS INTERNATIONAL; CAMPUS CRUSADE FOR CHRIST; THE CHRISTIAN LEGAL SOCIETY CENTER FOR LAW AND

No. 00-1515

RELIGIOUS FREEDOM; THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS; THE COLORADO BAPTIST GENERAL CONVENTION (SOUTHERN BAPTIST); THE COLORADO CATHOLIC CONFERENCE; THE COLORADO DISTRICT CHURCH OF THE NAZARENE; THE COLORADO MUSLIM SOCIETY; THE COLORADO TASK FORCE ON RELIGIOUS FREEDOM; THE FIRST CHURCH OF CHRIST, SCIENTIST; THE GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS; THE GENERAL COUNCIL ON FINANCE AND ADMINISTRATION OF THE UNITED METHODIST CHURCH; THE ISLAMIC SOCIETY OF COLORADO SPRINGS; LUTHERAN CHURCH - MISSOURI SYNOD; MID-AMERICA UNION CONFERENCE OF SEVENTH-DAY ADVENTISTS; NATIONAL FEDERATION FOR CATHOLIC YOUTH MINISTRY; THE NAVIGATORS; NEW LIFE CHURCH; THE NET, formerly The Colorado Springs Association of Evangelicals; PRESBYTERIAN CHURCH (U.S.A.); THE PUEBLO ASSOCIATION OF EVANGELICALS; THE ROCKY MOUNTAIN CONFERENCE OF SEVENTH-DAY ADVENTISTS; THE ROCKY MOUNTAIN CONFERENCE OF THE UNITED METHODIST CHURCH; THE ROCKY MOUNTAIN RABBINICAL COUNCIL; THE ROCKY MOUNTAIN SYNOD, EVANGELICAL LUTHERAN CHURCH OF AMERICA; UNITED STATES CATHOLIC CONFERENCE; YOUNG LIFE,

     Amici Curiae.

---

Patricia S. Bangert, Powers Phillips, P.C., Denver, Colorado, appearing for Appellants.

L. Martin Nussbaum (Samuel M. Ventola, with him on the brief), Colorado Springs, Colorado, appearing for Appellees.

Von G. Keetch and Alexander Dushku, Kirton & McConkie, Salt Lake City, Utah, filed an amicus curiae brief in support of appellees Episcopal Church in the Diocese of Colorado, et al.

---

Before **TACHA**, Chief Judge, **KELLY**, and **HARTZ**, Circuit Judges.

---

**TACHA**, Chief Circuit Judge.

Plaintiffs Lee Ann Bryce and Reverend Sara Smith brought a sexual harassment suit against St. Aidan's Episcopal Church and others for remarks made about homosexuals and about the plaintiffs' homosexual activities. St. Aidan's Church asserts that the First Amendment bars plaintiffs' sexual harassment claims because the remarks were made as part of ecclesiastical discussions on church policy towards homosexuals. The district court agreed, granting summary judgment for the defendants.

The plaintiffs ask this court to insert itself into a theological discussion about the church's doctrine and policy towards homosexuals – one of the most important ongoing dialogues in many churches today. We decline to do so.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM.

## I. Background

St. Aidan's Episcopal Church hired Lee Ann Bryce in 1997 to serve as its Youth Minister. Bryce was a Christian and had substantial experience in church leadership, though she was neither an ordained minister nor a member of the Episcopal Church. Bryce began working as St. Aidan's Youth Minister on September 1, 1997. Bryce led the youth group in a variety of activities, including weekly meetings, service projects, recreational activities, social events, visits to other churches, and prayer. In addition, Bryce served as an assistant music minister and as a liaison between the youth and other parish ministries.

On November 21, 1998, Bryce had a civil commitment ceremony with her partner and co-plaintiff Reverend Sara Smith at the First Congregational Church of Christ in Boulder, where Smith is an ordained minister. Smith is not associated with St. Aidan's or the Episcopal Church in any way.

In response to the commitment ceremony, co-defendants Reverend Donald Henderson, Reverend Neysa Ellgren, and Mary Wilder, a member of the Vestry and chair of St. Aidan's Youth Board, met with Bryce in January 1999. They informed her that she would be terminated as Youth Minister effective June 1999 because she was violating Episcopal doctrine, which teaches that people should be married and faithful or single and celibate. Defendant Henderson proposed that,

after June 1999, Bryce take a position as Adult Christian Education Coordinator and Assistant Music Director until the end of 1999, after which she would be terminated by St. Aidan's.

Episcopal doctrine on homosexuality is articulated in the Lambeth Resolution, which is the result of a conference of bishops from the worldwide Anglican communions held every ten years in Lambeth, England. The 1998 Lambeth Resolution provides that "[t]his conference . . . in view of the teaching of Scripture, upholds faithfulness in marriage between a man and a woman in lifelong union, and believes that abstinence is right for those who are not called to marriage." The resolution also "reject[s] homosexual practice as incompatible with Scripture, [but] calls on all our people to minister pastorally and sensitively to all irrespective of sexual orientation and to condemn irrational fear of homosexuals." The resolution further provides that the conference "cannot advise the legitimizing or blessing of same-sex unions, nor the ordination of those involved in such unions."

Rev. Henderson sent several letters and memoranda to the Vestry and other leaders of St. Aidan's to inform them of the situation. In a letter dated January 4, 1999, Rev. Henderson reported: "[Bryce] states that she is a lesbian and that she chooses to live in a sexual relationship with Rev. Sara Smith." He explained his proposal that Bryce change positions in June 1999 and end her employment at the

end of 1999. He also warned that the situation could be divisive, and he asked recipients to read attached information packets. According to Bryce, these materials stated that homosexuality is a sin, that homosexuals are unfit to work with children, that homosexuals are promiscuous, that modern homosexual practices are part of demonic forms of idolatry, and that homosexuals suffer from loathsome diseases.

At a Vestry meeting on February 9, 1999, church leaders decided to host four parish meetings to inform the congregation about homosexuality and Bryce's employment situation. Bryce supported the idea of such a parish dialogue, though she objected to the format of the meetings. St. Aidan's chose to invite active members of the church, as well as some college students involved in an "Episcopalians on Campus" ministry. Callers invited church members by phone, following a script stating that the meetings were being held to discuss the Youth Minister being "in a relationship that is outside the core teaching of our church about marriage."

St. Aidan's invited about one-fourth of the parish's active members to each of the four meetings, which were held February 25-28, 1999. At the meetings, St. Aidan's distributed copies of the Lambeth Resolution and a handout. The handout stated that the Rev. Henderson was attempting to reach a compromise that would allow him to be faithful to the Bishop and the Lambeth Resolution,

and also to serve the best interest of the youth, the Youth Minister, and St. Aidan's. The handout further stated that the meetings were intended to strengthen parish communications, that all remarks should be "as positive and affirming as possible," and that the parishioners should keep the discussions confidential. The meetings started with prayer. A professional facilitator then instructed the parishioners on respectful conversation. Rev. Henderson and Bryce each made a ten-minute opening statement, after which parishioners were allowed to ask questions and make comments. Rev. Henderson had suggested that Smith attend the meetings to provide support for Bryce, and she attended at Bryce's invitation.

The parish meetings addressed the issue of homosexuality and the church in general, as well as Bryce and Smith. The overwhelming majority of those who spoke at the meetings supported Bryce, but there were also a number of statements to which Bryce objected, including the following:

- "Lee Ann is living in a sexual relationship outside of Christian marriage."

- "When did you start having sex with Sara?"

- "Gay people are very nice, but it worries [me] why gay people want to work with children."

- "My husband and I were always worried about the paper boy coming in, and we always protected our children from him."

- "I am sorry that Lee Ann has chosen this lifestyle which precludes her from working with children."

- "Of course Father Don is right, we can't let these gay people come into the

church and work with our children."

• "Homosexual people engaged in same sex relationships because heterosexual relationships were too difficult, it was too difficult to make a heterosexual marriage work . . . ."

• One individual allegedly used the term "lesbian" with a derisive tone.

Bryce remained at St. Aidan's until June 1999, when she was terminated as Youth Minister and left the church.

Based on these statements, as well as statements that Rev. Henderson made in his letters and memoranda, Bryce and Smith claimed that they had been sexually harassed. Plaintiff Bryce alleged three causes of action: Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 1985(3); and 42 U.S.C. § 1986. Plaintiff Smith brought claims only under 42 U.S.C. §§ 1985(3) and 1986.

The case was filed in the U.S. District Court for the District of Colorado and assigned to Judge Clarence Brimmer. Sua sponte, Judge Brimmer raised the issue of whether he should recuse himself from the case because he is a member of an Episcopal church in Cheyenne, Wyoming. He concluded that a reasonable person knowing all the relevant facts would not harbor doubts about his impartiality in the case, and declined to recuse himself. The plaintiffs moved the court to reconsider its decision, but the court denied the motion.

Defendants filed a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, contending that plaintiffs' claims were barred by the First

Amendment Free Exercise and Establishment Clauses. The district court converted defendants' Rule 12(b)(1) motion to dismiss into a Rule 56(c) motion for summary judgment. The court granted the motion and dismissed all claims, finding that they were precluded by the church autonomy doctrine of the First Amendment.

## II. Discussion

On appeal, plaintiffs challenge: (1) conversion of the defendants' motion to dismiss into a motion for summary judgment; (2) the application of the church autonomy doctrine; and (3) the district court judge's refusal to recuse himself from the case.

### A. Conversion of Motion to Dismiss

Both parties assert that the district court erred in converting defendants' 12(b)(1) motion to dismiss into a Rule 56(c) motion for summary judgment. As a general rule, a 12(b)(1) motion may not be converted into a Rule 56 motion for summary judgment. Wheeler v. Hurdman, 825 F.2d 257, 259 (10th Cir. 1987).

There is an exception to the general rule against conversion, however, when the defendants' underlying challenge on a 12(b)(1) motion is not to jurisdiction, but to the sufficiency of the plaintiffs' claim: "Defendants often move to dismiss for lack of subject matter jurisdiction when they are actually challenging the legitimacy of plaintiff's claim for relief. When outside evidence is presented to

-9-

support a Rule 12(b)(1) motion of this type, the court will bring the conversion provision [requiring conversion of a 12(b)(6) motion into a Rule 56 motion] into operation." 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1366, at 485-86 n.9 (2d ed. 1990) (citing cases); see also Malak v. Associated Physicians, Inc., 784 F.2d 277, 279-80 (7th Cir. 1986). The crucial element is the substance of the motion, not whether it is labeled a Rule 12(b)(1) motion rather than 12(b)(6). 5A Wright & Miller § 1366, at 485 ("It is not relevant how the defense is actually denominated.").

Here, St. Aidan's Church raised the church autonomy defense on a motion to dismiss for lack of subject matter jurisdiction. The motion would more appropriately be considered as a challenge to the sufficiency of plaintiff's claims under Rule 12(b)(6). If the church autonomy doctrine applies to the statements and materials on which plaintiffs have based their claims, then the plaintiffs have no claim for which relief may be granted. In this sense, the assertion that the First Amendment precludes the sexual harassment suit is similar to a government official's defense of qualified immunity, which is frequently asserted in a motion to dismiss under Rule 12(b)(6) or Rule 56. See, e.g., Medina v. Cram, 252 F.3d 1124, 1131 (10th Cir. 2001) (calling qualified immunity "a question of law to be

resolved at the earliest possible stage of litigation").[1]

We review for an abuse of discretion a district court's decision to consider evidence beyond the pleadings and convert a motion to dismiss to a motion for summary judgment. Lowe v. Town of Fairland, Okla., 143 F.3d 1378, 1381 (10th Cir. 1998).

St. Aidan's attached 46 exhibits in support of its motion, including affidavits, deposition testimony, and other documents, thus triggering conversion to a Rule 56 motion. Fed. R. Civ. P. 12(b) ("If, [on a 12(b)(6) motion], matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment . . . ."). To properly convert a Rule 12(b) motion, the trial court is required to notify the parties of the conversion so that they may present all materials made relevant by Rule 56. Whitesel v. Sengenberger, 222 F.3d 861, 866 (10th Cir. 2000). Both St. Aidan's Church and plaintiffs received ample notice from the district court of the conversion and submitted numerous exhibits beyond the pleadings.

---

[1] Of course, the doctrines and their inquiries are quite different, as are the reasons for addressing them early in the litigation process. Qualified immunity "avoid[s] excessive disruption of government and permit[s] the resolution of many insubstantial claims on summary judgment." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). As we explain below, the church autonomy doctrine, in a case like this one, protects a church's Free Exercise rights. By resolving the question of the doctrine's applicability early in litigation, the courts avoid excessive entanglement in church matters.

We therefore find that the district court did not abuse its discretion in converting the defendants' motion to dismiss into a motion for summary judgment.

B.     Church Autonomy Doctrine

On summary judgment, the district court dismissed plaintiffs' claims as barred by the church autonomy doctrine of the First Amendment. In its ruling, the court stated that the courts have "essentially no role in determining ecclesiastical questions, or religious doctrine and practice."

We review the grant of summary judgment de novo, applying the same standard as the district court. Wark v. United States, 269 F.3d 1185, 1187 (10th Cir. 2001). Summary judgment is appropriate when there is no genuine issue of material fact, viewing the evidence in the light most favorable to the nonmoving party. Id.

Courts have held that churches have autonomy in making decisions regarding their own internal affairs. This church autonomy doctrine prohibits civil court review of internal church disputes involving matters of faith, doctrine, church governance, and polity. Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 116-17 (1952). The doctrine is rooted in the First Amendment's Free Exercise and Establishment Clauses. Bollard v. Cal. Province of the Soc'y of Jesus, 211 F.3d 1331, 1332 (9th Cir. 2000) (order denying rehearing en banc) (Wardlaw, J.,

dissenting) ("Though the concept originated through application of the Free Exercise Clause, the Supreme Court has held that the Establishment Clause also protects church autonomy in internal religious matters."); see also Douglas Laycock, Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy, 81 Colum. L. Rev. 1373, 1381-84 (1981) (arguing that church autonomy is protected by the Free Exercise Clause rather than the Establishment Clause because it protects against burdens or restrictions on religion, whereas the Establishment Clause prevents sponsorship and active involvement of the government in religion).

The doctrine is also rooted in "a long line of Supreme Court cases that affirm the fundamental right of churches to 'decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" EEOC v. Catholic Univ. of Am., 83 F.3d 455, 462 (D.C. Cir. 1996) (quoting Kedroff, 344 U.S. at 116). The church autonomy line of cases begins with Watson v. Jones, 80 U.S. (13 Wall.) 679 (1871), in which the Court declined to intervene in a property dispute between two factions of a church. The Court found that secular courts are bound by the decision of the highest church judicatory in internal matters of faith or ecclesiastical rule. Id. at 727.

The Court applied the church autonomy principle again in Gonzales v. Roman Catholic Archbishop, when it upheld a church's right to determine

conclusively the essential qualifications of a chaplain and whether a candidate possessed them. 280 U.S. 1, 16 (1929). The Court stated, "In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise." Id. at 16.

In Kedroff v. St. Nicholas Cathedral, the Court struck down as unconstitutional a statute changing who in the church would control a cathedral. 344 U.S. 94. In its ruling, the Court interpreted Watson as guaranteeing churches the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." Id at 116. The Court went on to recognize the church autonomy principle announced by Watson and Gonzales as a constitutional rule arising out of the Free Exercise Clause of the First Amendment, stating that "[f]reedom to select the clergy . . . [has] federal constitutional protection as a part of the free exercise of religion against state interference." Id. In another dispute for control of the St. Nicholas Cathedral, the Court found that the constitutional prohibition against interfering with the church's free exercise of religion applied to the judiciary as well as the legislature. Kreshik v. St. Nicholas Cathedral, 363 U.S. 190, 191 (1960).

The Court has made clear that the constitutional protection extends beyond

-14-

the selection of clergy to other internal church matters. In <u>Serbian Eastern Orthodox Diocese v. Milivojevich</u>, for example, the Court held that the First Amendment church autonomy doctrine "applies with equal force to church disputes over church polity and church administration." 426 U.S. 696, 710 (1976). In <u>Milivojevich</u>, the Court declined to intervene where the Mother Church had defrocked a bishop and reorganized the diocese.

The principles articulated in the church autonomy line of cases also apply to civil rights cases. For example, courts have recognized a ministerial exception that prevents adjudication of Title VII employment discrimination cases brought by ministers against churches. <u>E.g.</u>, <u>EEOC v. Catholic Univ. of Am.</u>, 83 F.3d 455 (D.C. Cir. 1996); <u>McClure v. Salvation Army</u>, 460 F.2d 553 (5th Cir. 1972). The right to choose ministers is an important part of internal church governance and can be essential to the well-being of a church, "for perpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its doctrines both to its own membership and to the world at large." <u>Rayburn v. General Conference of Seventh-Day Adventists</u>, 772 F.2d 1164, 1168 (4th Cir. 1985).

The Supreme Court's decision in <u>Employment Division v. Smith</u>, 494 U.S. 872 (1990) does not undermine the principles of the church autonomy doctrine. In <u>Smith</u>, the Court found that laws burdening individuals' religious practices

need not be justified by a compelling governmental interest if they are neutral and generally applicable. Id. at 879. Several circuits have examined whether the ministerial exception survives in light of Smith, and each has concluded that it does. EEOC v. Roman Catholic Diocese, 213 F.3d 795, 800 n.* (4th Cir. 2000); Gellington v. Christian Methodist Episcopal Church, 203 F.3d 1299, 1302-04 (11th Cir. 2000); Combs v. Central Tex. Annual Conference of the United Methodist Church, 173 F.3d 343, 348-50 (5th Cir. 1999); Catholic Univ., 83 F.3d at 461-63. These courts reason that, unlike Smith, the ministerial exception addresses the rights of the church, not the rights of individuals. Catholic Univ., 83 F.3d at 462. In addition, the ministerial exception cases rely on a long line of Supreme Court cases affirming the church autonomy doctrine, which protects the fundamental right of churches to decide for themselves matters of church government, faith, and doctrine. Id. These cases' rationale extends beyond the specific ministerial exception to the church autonomy doctrine generally, and we therefore find that the church autonomy doctrine remains viable after Smith.

The church autonomy doctrine is not without limits, however, and does not apply to purely secular decisions, even when made by churches. Before the church autonomy doctrine is implicated, a threshold inquiry is whether the alleged misconduct is "rooted in religious belief." Wisconsin v. Yoder, 406 U.S. 205, 215 (1972). As the Fourth Circuit stated:

-16-

> Of course churches are not – and should not be – above the law.
> Like any other person or organization, they may be held liable for
> their torts and upon their valid contracts. Their employment
> decisions may be subject to Title VII scrutiny, where the decision
> does not involve the church's spiritual functions.

Rayburn, 772 F.2d at 1171. Similarly, the Florida Supreme Court recently held that the First Amendment does not protect a church from a negligent hiring claim if the church's actions were not motivated by sincerely held religious beliefs or practices. Malicki v. Doe, 2002 WL 390021, at *8 (Fla. Mar. 14, 2002). The issue in the present case, then, is whether the dispute is ecclesiastical or secular:

> The question that we must resolve in the case before us, therefore, is
> whether the dispute . . . is an ecclesiastical one about "discipline,
> faith, internal organization, or ecclesiastical rule, custom or law," or
> whether it is a case in which we should hold religious organizations
> liable in civil courts for "purely secular disputes between third
> parties and a particular defendant, albeit a religiously affiliated
> organization."

Bell v. Presbyterian Church, 126 F.3d 328, 331 (4th Cir. 1997) (citations omitted). Bryce and Smith complain about allegedly sexually harassing remarks made in written correspondence between Rev. Henderson and other church leaders, and remarks made at a series of church meetings. We must determine whether the defendants' alleged statements were ecclesiastical statements protected by church autonomy or purely secular ones.

After Bryce and Smith's civil commitment ceremony, Rev. Henderson wrote other church leaders in January 1999 to explain his proposal that Bryce stop

serving as Youth Minister after June 1999 and that she leave church employment altogether at the end of 1999. In his letters, Rev. Henderson stated that the issue of homosexuality is "[o]ne of the most critical and difficult subjects of our time." He attached to his January 8, 1999 letter materials on homosexuality provided by plaintiff Smith and materials he had gathered himself, including the Lambeth Resolution. He stated in the letter that he submitted these materials "with the pure intent of starting the important dialogue about homosexuality and other difficult subjects facing the Episcopal Church." Plaintiffs complain that Rev. Henderson's materials made offensive and harassing statements about homosexuals.

St. Aidan's Church also held a series of meetings for church members. The purpose of these meetings was four-fold: to address Bryce's employment situation within the church; to provide religious education; to engage in sacred conversation; and to ensure healthy parish communication. At these meetings, the parishioners mainly discussed religious topics, including Biblical interpretation, Christian sexual ethics, the meaning of the Lambeth Resolution, and Episcopal liturgical practices. They also made several statements that Bryce and Smith found offensive. Representatives of St. Aidan's allegedly stated that Bryce and Smith were living in a sexual relationship, that Bryce was unfit to work with children, and that homosexuals choose same-sex relationships because they find

heterosexual relationships too difficult. Other individuals at the meetings made statements that Bryce and Smith found offensive, including comments about the negative influence of homosexuals on children and a question about when Bryce and Smith began having sex.

The statements made at the church meetings, in Rev. Henderson's letters, and in materials Rev. Henderson attached to his letters may be offensive, and some of the statements may be incorrect, but they are not actionable. The defendants' alleged statements fall squarely within the areas of church governance and doctrine protected by the First Amendment. Rev. Henderson's letters to other church leaders discussed an internal church personnel matter and the doctrinal reasons for his proposed personnel decision. The series of meetings addressed the same issues, and also facilitated religious communication and religious dialogue between a minister and his parishioners. At the time the offensive statements were made, Bryce was an employee of the church subject to its internal governance procedures. While churches do not operate above the law, we find that the dispute here "is an ecclesiastical one about 'discipline, faith, internal organization, or ecclesiastical rule, custom or law,'" and not a "purely secular dispute" with a third party. Bell, 126 F.3d at 331.[2]

---

[2] The district court relied partially on the ministerial exception of the church autonomy doctrine in dismissing Bryce's claims. Consideration of the
(continued...)

-19-

Plaintiff Smith contends that, unlike Bryce, she had no relationship with St. Aidan's and must be considered a third party who is not subject to internal church disciplinary procedures. This argument misses the mark. The church autonomy doctrine is rooted in protection of the First Amendment rights of the church to discuss church doctrine and policy freely. The applicability of the doctrine does not focus upon the relationship between the church and Rev. Smith. It focuses instead on the right of the church to engage freely in ecclesiastical discussions with members and non-members. Rev. Smith voluntarily attended the four meetings and voluntarily became part of St. Aidan's internal dialogue on homosexuality and Bryce's employment.

Rev. Smith's situation is therefore different from that of the plaintiff in Guinn v. Church of Christ of Collinsville, 775 P.2d 776 (Okla. 1989). In Guinn, the church leaders threatened to broadcast to the congregation the plaintiff's sexual relations outside of marriage unless she repented. Id. at 768. In a failed attempt to prevent this disciplinary action, Guinn withdrew her membership in the church and hired an attorney who advised the church not to mention her name in

---

[2](...continued)
ministerial exception would require us to determine whether Bryce, as Youth Minister, was a "minister" for purposes of this exception. See, e.g., Roman Catholic Diocese, 213 F.3d at 801. We find this inquiry unnecessary, however, because Bryce's claims are based solely on communications that are protected by the First Amendment under the broader church autonomy doctrine.

church.  Id. at 768-69.  Guinn brought suit for invasion of privacy and intentional infliction of emotional distress.  The Oklahoma Supreme Court rejected the church's First Amendment defense, finding that Guinn had effectively withdrawn from the church and was no longer subject to internal church discipline.  Unlike Guinn, who was an external third party, Rev. Smith affirmatively interjected herself into the church's internal ecclesiastical dialogue.  Moreover, the defendants here did not invade the plaintiff's privacy as did the church leaders in Guinn.

A slightly different situation arises, however, with respect to the letters Rev. Henderson sent to other church leaders prior to the meetings.  Smith did not participate in drafting the letters and did not have an opportunity to object to their contents.  She was therefore a non-consenting third party.  As previously noted, statements that churches make about third parties are not protected by the First Amendment when they address purely secular matters.  Bell, 126 F.3d at 331.

Rev. Henderson's statements clearly addressed religious topics, however, and he made them in the context of an internal church dialogue.  Henderson sought to educate church leaders on church doctrine on homosexuality and how it related to Bryce's employment within the church.  Henderson's only direct reference to Smith was made in passing, when he reported that "[Bryce] states that she . . . chooses to live in a sexual relationship with the Rev. Sara Smith."

Henderson made statements opposing homosexuality and asked the recipients to read materials that he enclosed or referenced. These materials made a number of statements in opposition to homosexuality, including statements that homosexuals are promiscuous, suffer odious diseases, are engaged in sin, and are unfit to work with children. While Smith found these statements objectionable, they were neither libel of Smith with actual malice nor a public disclosure of intimate matters that had previously been private. We find that these statements were not purely secular disputes with third parties, but were part of an internal ecclesiastical dispute and dialogue protected by the First Amendment. Kedroff, 344 U.S. at 116; see also Cimijotti v. Paulsen, 230 F. Supp. 39, 41 (N.D. Iowa 1964) (finding that the First Amendment precluded the maintenance of a slander action based solely upon statements made to the Catholic Church before its recognized officials and under its disciplines and regulations).

Thus, plaintiffs' claims are barred by the church autonomy doctrine, and the district court properly granted summary judgment for the defendants. Because we find that the church is protected from this suit by the church autonomy doctrine, we need not address the other defenses raised by St. Aidan's.

C.  Refusal to Recuse

Plaintiffs' final challenge is to the district court judge's refusal to recuse himself from these proceedings despite belonging to an Episcopal church. We

review the denial of a motion to recuse for an abuse of discretion. <u>Cauthon v. Rogers</u>, 116 F.3d 1334, 1336 (10th Cir. 1997).

Bryce and Smith rely on 28 U.S.C. § 455(a) and (b)(1), which requires a judge to disqualify himself if "his impartiality might reasonably be questioned" or if "he has a personal bias or prejudice concerning a party." The trial judge must recuse himself when there is the appearance of bias, regardless of whether there is actual bias. <u>Nichols v. Alley</u>, 71 F.3d 347, 350 (10th Cir. 1995). "The test is whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality." <u>Hinman v. Rogers</u>, 831 F.2d 937, 939 (10th Cir. 1987) (citation omitted). If the issue of whether § 455 requires disqualification is a close one, the judge must be recused. <u>Nichols</u>, 71 F.3d at 352.

On the other hand, a judge also has "as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require." <u>Id.</u> at 351. The recusal statute should not be construed so broadly as to become presumptive or to require recusal based on unsubstantiated suggestions of personal bias or prejudice. <u>Switzer v. Berry</u>, 198 F.3d 1255, 1258 (10th Cir. 2000); <u>see also</u> <u>United States v. Cooley</u>, 1 F.3d 985, 993 (10th Cir. 1993) ("The statute is not intended to give litigants a veto power over sitting judges, or a vehicle for obtaining a judge of their choice.").

Our determination in a recusal case is "extremely fact driven." <u>Nichols</u>, 71

F.3d at 352.  The facts of this case provide only one suggestion of partiality.

Judge Brimmer is a member of an Episcopal church, and this dispute involves an

Episcopal church.  The facts support no other implication of bias.  Judge

Brimmer's church is in Cheyenne, Wyoming, not Boulder, Colorado.  He is

connected with neither St. Aidan's Episcopal Church nor any of the parties in the

case.  He does not have any independent knowledge of the facts or events at issue.

Plaintiffs assert that Judge Brimmer's membership in an Episcopal church

alone creates an appearance of bias.  But courts have consistently held that

membership in a church does not create sufficient appearance of bias to require

recusal.  Singer v. Wadman, 745 F.2d 606, 608 (10th Cir. 1984); Feminist

Women's Health Ctr. v. Codispoti, 69 F.3d 399, 400-01 (9th Cir. 1995); Menora

v. Ill. High Sch. Ass'n, 527 F. Supp. 632, 634 (N.D. Ill. 1981); Idaho v. Freeman,

507 F. Supp. 706, 729 (D. Idaho 1981).  In Freeman, for example, the court held

that a judge did not need to recuse himself where he had been a leader in a church

that had taken a public position on the matter before the court.  507 F. Supp. 706.

The court reasoned that "religious beliefs or membership affiliation are presumed

not to be relevant."   Id. at 731.  In Menora, Orthodox Jewish plaintiffs

challenged a rule that would prevent them from playing on the high school

basketball team unless they removed their yarmulkes in contravention of their

religious beliefs.  527 F. Supp. 632.  The trial judge, who was also Jewish, found

it unnecessary to recuse himself, rejecting the implicit assumption that members of a religious organization necessarily agree with the positions of the organization's governing body. Id. at 636.

These cases are consistent with other associational bias cases, which have found that group membership alone is insufficient to create the appearance of bias. Pennsylvania v. Local Union 542, Int'l Union of Operating Eng'rs, 388 F. Supp. 155 (E.D. Pa. 1974). In Local Union 542, for example, Judge Higginbotham refused to recuse himself from a civil rights case on the grounds that he was African-American, stating: "The facts pleaded will not suffice to show the personal bias required by the statute if they go to the background and associations of the judge rather than to his appraisal of a party personally." Id. at 159; see also Blank v. Sullivan and Cromwell, 418 F. Supp. 1, 4 (S.D.N.Y. 1975) (finding recusal unnecessary in a civil rights case even though the judge was African-American and had represented many civil rights plaintiffs in private practice).

Thus, the district court did not abuse its discretion in finding that no "reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality." Hinman, 831 F.2d at 939.

### III. Conclusion

When a church makes a personnel decision based on religious doctrine, and

holds meetings to discuss that decision and the ecclesiastical doctrine underlying it, the courts will not intervene.  We therefore AFFIRM the ruling of the district court.  Appellees' motion to strike appellant's opening brief is denied.