**INDIANA AREA FOUNDATION OF the UNITED METHODIST CHURCH, INC., d/b/a United Methodist Church, Bishop Michael Coyner, Ann Glass, and Robert Ostermeier, Appellants–Cross Appellees–Defendants.**

v.

**Lynn SNYDER, Appellee–Cross–Appellant–Plaintiff.**

No. 49A05–1011–CT–715.

Court of Appeals of Indiana.

Aug. 31, 2011.

John T. Neighbours, Jon Laramore, Susan W. Kline, Baker & Daniels, LLP, Indianapolis, IN, Attorneys for Appellants.

Darlene Robinson, Robinson & Associates, Oakland City, IN, Attorney for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

The Indiana Area Foundation of the United Methodist Church, Inc., d/b/a United Methodist Church ("the Church"), Bishop Michael Coyner, Reverend Ann Glass, and Reverend Robert Ostermeier (collectively "the Appellants") appeal the denial of their motion for summary judgment on Reverend Lynn Snyder's defamation claim. Reverend Snyder cross-appeals the trial court's decision granting the Appellants' motion for summary judgment on his breach of contract claim. We affirm in part, reverse in part, and remand.

### Issues

The Appellants raise two issues, which we consolidate and restate as whether the trial court properly denied their motion for summary judgment on Reverend Snyder's defamation claim. On cross-appeal, Reverend Snyder raises one issue, which we restate as whether the trial court properly granted the Appellants' motion for summary judgment on his breach of contract claim.

### Facts

Reverend Snyder was appointed as pastor of the Bloomfield United Methodist Church ("Bloomfield Church") in 2004. Bishop Coyner is a bishop in the Church.[1] Reverend Ostermeier is an ordained elder of the Church and is a district superintendent. Reverend Glass is the chairperson of the Board of the Ordained Ministry ("the Board"). The Board is a group of elders, deacons, and professing lay persons who credential ministers, receive and respond to complaints about Church clergy, provide support to ministers, and interpret the ethical standards of ministry. Within the Church, The Book of Discipline of The United Methodist Church ("The Book of Discipline") outlines the law, doctrine, administration, and organization of the Church.

In August 2006, Reverend Snyder was involved in an incident with Julie Martin, the adult daughter of a parishioner of the Bloomfield Church. Specifically, Reverend Snyder, in his ministerial capacity and based on Martin's mother's request, arranged a meeting with Martin at a restaurant in Linton. Reverend Snyder claims that during the meeting, Martin did something to him, possibly drugging him, causing him to lose consciousness for a few minutes while at the restaurant and to suffer memory loss that night and the following day. After the meeting, Reverend Snyder wrote to Martin four times and repeatedly called her. Reverend Snyder and Martin both made allegations that resulted in the involvement of law enforcement officers and the Greene County Prosecutor's Office.

---

1. For simplicity, we omit the regional and geographic organization of the Church.

In October 2006, based on allegations that Reverend Snyder acted in a manner inconsistent with his ministerial duties in his dealings with Martin, Reverend Ostermeier placed Reverend Snyder on study and renewal leave to investigate the allegations. In November 2006, Reverend Ostermeier initiated a formal intra-church complaint in accordance with The Book of Discipline. In December 2006, Reverend Glass informed Reverend Snyder of the Board's decision to impose a ninety-day suspension and instructed him to undergo a psychological evaluation through Methodist Hospital, which Reverend Snyder did.

In 2007, the Board gave Reverend Snyder the choice of being placed on a voluntary leave of absence or an involuntary leave of absence and indicated it would be less difficult to return from voluntary leave. Reverend Snyder chose to be placed on an involuntary leave of absence. Reverend Snyder was also informed that the earliest possible time he could request to be returned to active status was at the Church's 2008 annual conference. The Board also required Reverend Snyder to undergo a medical exam and counseling with a Board-approved psychiatrist to address its concerns.

In accordance with this request and with Reverend Snyder's permission, Reverend Glass communicated the Board's concerns, instructions, and background information to the health care providers involved in Reverend Snyder's psychological examination and treatment. Reverend Snyder underwent the examinations as requested. The review process continued, and in June 2008, the Church directed Reverend Snyder to undergo an assessment at the Midwest Ministry Development before returning to any active appointment as a pastor. As of July 2009, Reverend Snyder had refused to undergo an evaluation at the Midwest Ministry Development. During this process, Reverend Ostermeier and Bishop Coyner informed the parishioners of the Bloomfield Church of Reverend Snyder's status and responded to their inquiries about Reverend Snyder.

On October 23, 2008, Reverend Snyder filed a complaint against the Appellants alleging breach of contract and defamation. In 2009, an order of protection was issued, prohibiting Reverend Snyder from, among other things, communicating with Martin and requiring him to stay away from the Bloomfield Church. On July 29, 2009, the Appellants moved for summary judgment on the basis that the First Amendment to the United States Constitution prohibited the trial court from hearing the matters raised in the complaint. On July 16, 2010, after Reverend Snyder responded and the Appellants replied, the trial court denied the Appellants' motion for summary judgment because material issues of fact existed. On August 10, 2010, the Appellants asked the trial court to reconsider its ruling or to certify the summary judgment order for interlocutory appeal. On October 26, 2010, the trial court issued an order granting summary judgment to the Appellants on the breach of contract claim and denying summary judgment on the defamation claim. The trial court also certified the order for interlocutory appeal. We accepted jurisdiction, and the parties now appeal.

## Analysis

The Appellants contend that the trial court improperly denied their motion for summary judgment on Reverend Snyder's defamation claim. On cross-appeal, Reverend Snyder argues that the trial court improperly granted summary judgment in favor of the Appellants on his breach of contract claim. Our review of a trial court's ruling on a motion for summary judgment is de novo. *Bules v. Marshall*

*County,* 920 N.E.2d 247, 250 (Ind.2010). "We must determine whether the evidence that the parties designated to the trial court presents a genuine issue of material fact and whether the moving party is entitled to a judgment as a matter of law." *Id.* (citing Ind. Trial Rule 56(C)). We construe all factual inferences in favor of the non-moving party and resolve all doubts as to the existence of a material issue against the moving party.[2] *Id.*

As our supreme court has explained, courts with general authority to hear matters like employment disputes are not denied subject matter or personal jurisdiction because the defendant pleads a religious defense. *Brazauskas v. Fort Wayne–South Bend Diocese, Inc.,* 796 N.E.2d 286, 290 (Ind.2003) (*"Brazauskas II "*), *cert. denied,* 541 U.S. 902, 124 S.Ct. 1602, 158 L.Ed.2d 244 (2004). "Rather, pleading an affirmative defense like the Free Exercise Clause may under certain facts entitle a party to summary judgment." *Id.* The Appellants' motion for summary judgment is based solely on the religious defense, not the merits of Reverend Snyder's claims. Accordingly, our review is based only on that defense.

Generally, the church autonomy doctrine deals with a church's First Amendment right to autonomy in making decisions regarding its own internal affairs including matters of faith, doctrine, and internal governance. *Brazauskas II,* 796 N.E.2d at 293 (citing *Bryce v. Episcopal Church in the Diocese of Colorado,* 289 F.3d 648, 655 (10th Cir.2002)). Acknowledging this doctrine's limitations, however, the *Brazauskas II* court observed, " 'The First Amendment does not immunize every legal claim against a religious institution and its members. The analysis in each case is fact-sensitive and claim specific, requiring an assessment of every issue raised in terms of doctrinal and administrative intrusion and entanglement.' " *Id.* at 293–94 (quoting *McKelvey v. Pierce,* 173 N.J. 26, 800 A.2d 840, 844 (2002)). It is within this framework that we consider the parties' assertions.

### I. Defamation

Although it is not entirely clear upon which precise statements Reverend Snyder relies to support his defamation claim, Reverend Snyder circuitously directs us to statements by Reverend Glass to mental health providers regarding Reverend Snyder's treatment and to Reverend Ostermeier's letters to parishioners and his formal intra-church complaint.[3] The Appellants contend, "When a minister asserts defamation claims against his church, and those claims relate to his suit-

**2.** Reverend Snyder contends there are issues of fact for trial. Although there are factual disputes, they are not material to the First Amendment issue. *See Bushong v. Williamson,* 790 N.E.2d 467, 474 (Ind.2003) (*"*A factual issue is material for the purposes of Trial Rule 56(C) if it bears on the ultimate resolution of a relevant issue."*).

**3.** The Appellants contend that, because Reverend Snyder supported only one of his claims of defamation with designated evidence during the summary judgment proceedings, the remaining claims are waived. We err on the side of caution and review the defamation claim based on the citations Reverend Snyder provides in the argument section of his Appellee's Brief. In his brief, Reverend Snyder directs us to portions of his complaint and his response to the Appellants' motion for summary judgment. From these references, we were able to glean what we assume are the allegedly defamatory statements by Reverend Glass and Reverend Ostermeier. As for the allegations against Bishop Coyner, Reverend Snyder directs us to page 9 of the Appendix, which is a photocopy of an envelope from the trial court to the Appellants' attorneys. In the absence of a more specific allegation regarding Bishop Coyner, we do not address this allegation further.

ability as a minister, judicial evolution of the claims unavoidably results in excessive entanglement."[4] Appellants' Br. p. 28. In response, Reverend Snyder contends that none of the statements have religious connotations and can be analyzed in a purely secular context.

Reverend Snyder relies entirely on our decision in *West v. Wadlington*, 908 N.E.2d 1157 (Ind.Ct.App.2009). As the Appellants point out, however, that opinion was vacated on September 22, 2010, when our supreme court granted transfer and reversed and remanded for further proceedings. *See West v. Wadlington*, 933 N.E.2d 1274 (Ind.2010) (concluding that because the case was treated as a motion to dismiss for lack of subject matter jurisdiction by the parties and the trial court, it was not ripe for adjudication employing a summary judgment standard of review).

■ Given the lack of valid legal authority presented by Reverend Snyder, we agree with the Appellants that this argument is waived. *See* Ind. Appellate Rule 46(A)(8)(a) (requiring a party's contentions to be supported by cogent reasoning and citations to the legal authorities relied on); *Shepherd v. Truex*, 819 N.E.2d 457, 463 (Ind.Ct.App.2004) ("The purpose of the appellate rules, especially Ind. Appellate Rule 46, is to aid and expedite review, as well as to relieve the appellate court of the burden of searching the record and briefing the case."). Under this circumstance, we review the Appellants' claim for prima facie error. *See Bright v. Kuehl*, 650 N.E.2d 311, 314 n. 3 (Ind.Ct.App.1995) ("Generally, a party waives any allegation of error if the party fails to provide any

citation to authority or statutes.... Such is akin to failure to file a brief, and subjects the appellee to reversal upon the appellant's showing of prima facie error.").

■ In determining whether the Appellants were entitled to summary judgment on the defamation claim, we look to *Brazauskas v. Fort Wayne–South Bend Diocese, Inc.*, 714 N.E.2d 253 (Ind.Ct.App. 1999) ("*Brazauskas I*"), *trans. denied*, which involved allegedly defamatory statements made by church officials after a church employee was fired. In that case, we observed that the initial determination of whether a communication is defamatory is a question of law for the trial court and that the communication must be viewed in context and given its plain and natural meaning, according to the idea it is calculated to convey to whom it is addressed. *Brazauskas I*, 714 N.E.2d at 262. We were persuaded by the following analysis from the Court of Special Appeals of Maryland:

> "When the conduct complained of occurs in the context of, or is germane to, a dispute over the plaintiff's fitness or suitability to enter into or remain a part of the clergy, however, it is difficult to see how the forbidden inquiry could be avoided. Questions of truth, falsity, malice, and the various privileges that exist often take on a different hue when examined in the light of religious precepts and procedures that generally permeate controversies over who is fit to represent and speak for the church."

*Id.* (quoting *Downs v. Roman Catholic Archbishop of Baltimore*, 111 Md.App. 616, 683 A.2d 808, 812 (1996)).

---

4. Reverend Snyder argues that the Appellants "attempt to say that Snyder is a minister who sued his 'church' for defamation. Snyder did not. He sued three individuals: Defendant Ann Glass, Defendant Michael Coyner and Defendant Robert Ostermeier." Appellee's Br. p. 14. Contrary to this assertion, Rever-

end Snyder named the Church in his complaint. His complaint also alleges that Bishop Coyner, Reverend Ostermeier, or Reverend Glass were employees of the Church. Without more, Reverend Snyder has not established that they were acting in their individual capacities.

In addressing Brazauskas's defamation claim, we acknowledged that society and the state have rightfully conferred significant importance on the protection of an individual's personal and professional reputation, even to the point of restricting the rights of others to communicate freely in this regard. *Id.* We concluded, however:

> when officials of a religious organization state their reasons for terminating a pastoral employee in ostensibly ecclesiastical terms, the First Amendment effectively prohibits civil tribunals from reviewing these reasons to determine whether the statements are either defamatory or capable of a religious interpretation related to the employee's performance of her duties.... [T]he First Amendment prevents this Court from scrutinizing the possible interpretations of defendants' statements and their purported reasons for uttering them; to conclude otherwise would effectively thrust this Court into the forbidden role of arbiter of a strictly ecclesiastical dispute over the suitability of a pastoral employee to perform her designated responsibilities.

*Id.* at 262–63.

 The right of the Church to choose its ministers without court intervention is protected by the First Amendment. *See Bryce,* 289 F.3d at 660 ("When a church makes a personnel decision based on religious doctrine, and holds meetings to discuss that decision and the ecclesiastical doctrine underlying it, the courts will not intervene."). Further:

> The right to choose ministers is an important part of internal church governance and can be essential to the well-being of a church, "for perpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its

doctrines both to its own membership and to the world at large."

*Id.* at 656 (quoting *Rayburn v. General Conference of Seventh–Day Adventists,* 772 F.2d 1164, 1168 (4th Cir.1985), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986)). "The ministerial exception cases rely on a long line of Supreme Court cases affirming the church autonomy doctrine, which protects the fundamental right of churches to decide for themselves matters of church government, faith, and doctrine." *Id.* at 656–57.

The statements at issue here involve Reverend Snyder's fitness for ministry. The statements specified by Reverend Snyder on appeal were either intra-church communications made to parishioners or Church officials regarding Reverend Snyder's status as a minister or were made to medical professionals in furtherance of assessing Reverend Snyder's competency to minister. Considering the Appellants' arguments and the absence of appropriate argument to the contrary, we conclude the Appellants have made a prima facie showing that the trial court erred by denying their motion for summary judgment on Reverend Snyder's defamation claim.

## II. *Breach of Contract*

On cross-appeal, Reverend Snyder argues that the trial court improperly granted the Appellants' motion for summary judgment on his breach of contract claim. The contractual basis for this claim is not entirely clear, but it appears to be based on the principles of The Book of Discipline. Nevertheless, apparently because the Appellants acknowledge that Reverend Snyder was a minister of the Church and was appointed to the Bloomfield Church in 2004, Reverend Snyder contends, "There is no need for discussion regarding the contract[.]" Cross–Appellant's Rep. Br. p. 2. Instead, Reverend Snyder claims the

issue is whether there was a breach of that agreement.

Although Reverend Snyder specifies seven alleged breaches, we cannot determine whether a breach occurred without first determining whether an enforceable contract existed and, if it did, the parties' respective rights under it. *See Smither v. Asset Acceptance, LLC,* 919 N.E.2d 1153, 1157 (Ind.Ct.App.2010) ("It is axiomatic that in order to recover for a breach of contract, a plaintiff must prove (1) a contract existed, (2) the defendant breached the contract, and (3) the plaintiff suffered damage as a result of the defendant's breach.... A plaintiff's burden to prove the existence of a contract also includes the burden of proving the terms of that contract.").

■ In considering Reverend Snyder's claim that The Book of Discipline created an enforceable contract capable of being breached, we are mindful of our decision in *McEnroy v. St. Meinrad School of Theology,* 713 N.E.2d 334, (Ind.Ct.App.1999), *trans. denied, cert. denied,* 529 U.S. 1068, 120 S.Ct. 1675, 146 L.Ed.2d 484 (2000). In that case, we considered claims of breach of contract, intentional interference with contractual relations, and breach of implied covenant of good faith and fair dealing claims brought by McEnroy, a former professor of Catholic theology and doctrine at St. Meinrad School of Theology. *McEnroy,* 713 N.E.2d at 335–36. McEnroy argued that the trial court could avoid violating the First Amendment's prohibition against excessive entanglement by applying neutral principles of contract law. *Id.* at 336. We observed:

> The Supreme Court has long held that the First Amendment requires civil courts to refrain from interfering in matters of church discipline, faith, practice and religious law. *Watson v. Jones,* 80 U.S. (13 Wall) 679, 727, 20 L.Ed. 666

(1871). Thus, civil courts are precluded from resolving disputes involving churches if "resolution of the disputes cannot be made without extensive inquiry ... into religious law and polity...." *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 709, 96 S.Ct. 2372, 2380, 49 L.Ed.2d 151 (1976). Consequently, the First Amendment proscribes intervention by secular courts into many employment decisions made by religious organizations based on religious doctrines or beliefs. Accordingly, personnel decisions are protected from civil court interference where review by civil courts would require the courts to interpret and apply religious doctrine or ecclesiastical law. *Milivojevich,* 426 U.S. at 696, 96 S.Ct. at 2372 [ ] (review of church's decision to defrock bishop impermissible where resolution required interpretation of internal church procedures).

*Id.* at 336–37. We interpreted the parties' contract to include reference to a hierarchical model specified by cannon law and other church doctrine. *Id.* at 337. We concluded that the resolution of McEnroy's claims would require the trial court to interpret and apply religious doctrine and ecclesiastical law, requiring the trial court to become "clearly and excessively entangled in religious affairs in violation of the First Amendment...." *Id.*

As in *McEnroy,* the trial court could not determine whether Reverend Snyder had an enforceable contract based on The Book of Discipline or whether the Appellants breached the purported contract without becoming excessively entangled in Church doctrine in violation of the First Amendment. Even by focusing on the alleged breaches alone, Reverend Snyder cannot remove the claim from the purview of the religious doctrine so as to avoid excessive entanglement. The trial court properly

granted summary judgment in favor of the Appellants on Reverend Snyder's breach of contract claim.

### Conclusion

The Appellants have established that they were entitled to summary judgment on Reverend Snyder's defamation claim, and we remand for the entry of summary judgment in favor of the Appellants on that claim. Further, Reverend Snyder has not established that summary judgment was improperly granted on his breach of contract claim. We affirm in part, reverse in part, and remand.

Affirmed in part, reversed in part, and remanded.

ROBB, C.J., and BRADFORD, J., concur.