Beverly M. **BRAZAUSKAS,**
**Appellant–Plaintiff,**

v.

**FORT WAYNE–SOUTH BEND DIO-CESE, INC., Sacred Heart Parish, and Jose Martelli, Appellees–Defendants.**

**No. 71A03–0102–CV–55.**

Court of Appeals of Indiana.

Sept. 7, 2001.

---

Stephen M. Terrell, Landman & Beatty, Indianapolis, IN, Attorney for Appellant.

William T. Hopkins, Jr., Michael A. Scheer, Barnes & Thornburg, Fort Wayne, IN, Attorneys for Appellees.

## OPINION

SHARPNACK, Chief Judge.

Beverly M. Brazauskas appeals the trial court's dismissal of her claims against Fort Wayne South Bend Diocese, Inc. ("the Diocese"), Sacred Heart Parish ("the Parish"), and Father Jose Martelli (collectively, "the Diocese defendants"). Brazauskas raises four claims, which we consolidate and restate as whether the trial court erred when it granted the Diocese defendants' motion to dismiss. We affirm.[1]

The relevant facts follow. The Parish is part of the Diocese and is located in South Bend on the campus of the University of Notre Dame ("Notre Dame").[2] Brazauskas had been employed at the Parish as a Pastoral Associate since 1987. However, Fr. Martelli, the Parish's pastor, dismissed Brazauskas on August 7, 1992. On February 26, 1993, Brazauskas filed suit against the Diocese defendants, alleging, among other claims, tortious interference with a business relationship.

While the suit was pending, a Notre Dame committee sought applicants to fill the position of Acting Director for Notre Dame's Program for Church Leaders ("PCL"). Brazauskas applied for the job.

After interviewing her, the committee conducting the search for an Acting Director unanimously recommended Brazauskas for the position on June 4, 1993. At some point between June 4 and June 18, 1993, Father Edward Malloy, the President of Notre Dame, was informed that Brazauskas was the recommended candidate for Acting Director of the PCL. Fr. Malloy rejected Brazauskas's candidacy because she was suing the Diocese, including its Bishop, John D'Arcy, and he concluded that hiring her would harm the relationship between the Diocese and Notre Dame. Furthermore, Fr. Malloy expressed surprise that the PCL was still in existence because he thought that it had been dissolved. The PCL was subsequently phased out.

Brazauskas believed that the Diocese defendants had contacted Notre Dame officials and induced them to avoid hiring her, even if they had to eliminate the PCL to do so. Accordingly, on August 5, 1993, she filed an amended complaint in which she amended her claim of tortious interference with a business relationship to include an allegation that the Diocese defendants had interfered with Notre Dame's hiring process. On September 7, 1995, Brazauskas further amended her complaint by accusing the Diocese defendants of blacklisting her.

In five separate motions, the Diocese defendants moved for summary judgment on all of Brazauskas's claims. The trial court granted summary judgment on all of Brazauskas's claims except her claims for tortious interference with a business relationship and blacklisting. Brazauskas appealed the trial court's grant of partial summary judgment, and we affirmed in

---

1. Appellant's Petition for oral argument is hereby denied.

2. As we discuss below, Notre Dame is not a part of the Diocese's organizational hierarchy, although it is expected to maintain a close relationship with the Diocese's bishop.

part, vacated in part, and remanded for further proceedings.[3] *See Brazauskas v. Fort Wayne–South Bend Diocese,* 714 N.E.2d 253, 264 (Ind.Ct.App.1999), *trans. denied* (*"Brazauskas I"*).

On remand, the Diocese defendants moved to dismiss Brazauskas's tortious interference and blacklisting claims on January 5, 2001. On February 7, 2001, after a hearing, the trial court granted the Diocese defendants' motion.

The sole issue is whether the trial court erred when it granted the Diocese defendants' motion to dismiss. In its order, the trial court provided that dismissal was appropriate "for the reason that this Court lacks subject matter jurisdiction to hear those claims." Appellant's App., p. 25. Consequently, we shall review the trial court's ruling as a dismissal for lack of subject matter jurisdiction pursuant to Ind. Trial Rule 12(B)(1).[4]

■ When ruling on a motion to dismiss for lack of subject matter jurisdiction, the trial court may consider not only the complaint and motion but also any affidavits or evidence submitted in support. *GKN Co. v. Magness,* 744 N.E.2d 397, 400 (Ind.2001). In *Magness,* our supreme court clarified the standard of review for appellate review of a trial court's ruling on a motion to dismiss for lack of subject matter jurisdiction. The court provided:

A review of the case authority shows that the standard of appellate review for Trial Rule 12(B)(1) motions to dismiss is indeed a function of what occurred in the trial court. That is, the standard of review is dependent upon: (i) whether the trial court resolved disputed facts; and (ii) if the trial court resolved disputed facts, whether it conducted an evidentiary hearing or ruled on a 'paper record.'

\* \* \* \* \*

■ If the facts before the trial court are in dispute, then our standard of review focuses on whether the trial court conducted an evidentiary hearing. Under those circumstances, the court typically engages in its classic fact-finding function, often evaluating the character and credibility of witnesses. Thus, where a trial court conducts an evidentiary hearing, we give its factual findings and judgment deference. And in reviewing the trial court's factual findings and judgment, we will reverse only if they are clearly erroneous. Factual findings are clearly erroneous if the evidence does not support them, and a judgment is clearly erroneous if it is unsupported by the factual findings or conclusions of law.

However, where the facts are in dispute but the trial court rules on a paper record without conducting an evidentiary hearing, then no deference is afforded the trial court's factual findings or judgment because under those circumstances a court of review is 'in as good a position as the trial court to determine whether the court has subject matter jurisdiction.' Thus, we review de novo a trial

---

**3.** We vacated the trial court's ruling on Brazauskas's claim for breach of contract. *Brazauskas I,* 714 N.E.2d at 260. However, the trial court subsequently dismissed that claim, and it is not at issue here.

**4.** Ind. Trial Rule 12(B)(1) provides, in relevant part:

Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required; except that at the option of the pleader, the following defenses may be made by motion:

(1) Lack of jurisdiction over the subject-matter, . . . .

court's ruling on a motion to dismiss where the facts before the court are disputed and the trial court rules on a paper record.

*Magness,* 744 N.E.2d at 401 (citations omitted).

Here, there are several disputes of fact. However, the trial court did not conduct an evidentiary hearing. Instead, it "held oral argument" on the Diocese defendants' motion to dismiss. Appellant's App., p. 25. Thus, we conclude that the trial court ruled upon a paper record without an evidentiary hearing, and we shall review its ruling under a de novo standard. *See Magness,* 744 N.E.2d at 401. In so doing, we will affirm the judgment of the trial court on any legal theory that the evidence of record supports. *Id.*

■ The central issue in this case is whether the First Amendment to the United States Constitution bars Brazauskas's remaining claims against the Diocese defendants. The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits courts from resolving doctrinal disputes or determining whether a religious organization acted in accordance with its canons and bylaws. *See Konkle v. Henson,* 672 N.E.2d 450, 454 (Ind.Ct.App.1996) (citing *Serbian E. Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 713, 96 S.Ct. 2372, 2382, 49 L.Ed.2d 151 (1976), *reh'g denied,* 429 U.S. 873, 97 S.Ct. 191, 50 L.Ed.2d 155 (1976)). Even where a dispute presented to the court is one that, if presented by any other set of litigants, would clearly be justiciable, if the resolution of that dispute between the litigants at hand would require the court to adjudicate matters of church doctrine or governance, or to second-guess ecclesiastical decisions made by a church body created to make those decisions, the matter falls outside the court's authority. *Downs v. Roman Catholic Archbishop,* 111 Md.

App. 616, 683 A.2d 808, 811 (1996), *reconsideration denied.*

■ The First Amendment does not entirely prohibit courts from opening their doors to religious organizations. *Konkle,* 672 N.E.2d at 455. Instead, a court can apply neutral principles of law to churches without violating the First Amendment. *Id.* However, the application of neutral principles of law to a church defendant has occurred only in cases involving church property or in cases where a church defendant's actions could not have been religiously motivated. *See Brazauskas I,* 714 N.E.2d at 262. For example, in *Konkle,* a priest-defendant molested the plaintiff and his superiors may have known about prior molestations but failed to act, and we concluded that the First Amendment did not bar the plaintiff's claims. *See Konkle,* 672 N.E.2d at 456.

As this precedent indicates, if, in resolving Brazauskas's claims of tortious interference with a business relationship and blacklisting, we would be required to interpret Catholic precepts and procedures to determine whether the allegedly tortious behavior was undertaken in compliance with religious teaching, then the First Amendment bars our inquiry, and the trial court did not err when it dismissed the claims. If, on the other hand, review of the claims would not require any inquiry into religious doctrine or practice, but rather involves application of secular standards to secular conduct, the First Amendment does not prevent Brazauskas from proceeding with her suit. *See Konkle,* 672 N.E.2d at 456. We will address each of Brazauskas's claims in turn.

I.

In Indiana, blacklisting is governed by statute. Ind.Code § 22–5–3–1 provides, in relevant part, "A person who, after having

discharged any employee from his service, prevents the discharged employee from obtaining employment with any other person commits a Class C infraction and is liable in penal damages to the discharged employee to be recovered by civil action;...." Furthermore, Ind.Code § 22–5–3–2 provides:

If any railway company or any other company, partnership, limited liability company, or corporation in this state shall authorize, allow or permit any of its or their agents to black-list any discharged employees, or attempt by words or writing, or any other means whatever, to prevent such discharged employee, or any employee who may have voluntarily left said company's service, from obtaining employment with any other person, or company, said company shall be liable to such employee in such sum as will fully compensate him, to which may be added exemplary damages.

Brazauskas alleges that the Diocese defendants blacklisted her by interfering with Notre Dame's hiring process for the Acting Director position. She points to the following evidence as support:

1. On November 4, 1992, Fr. Martelli sent a letter to Fr. Malloy and other Notre Dame officials informing them of Brazauskas's termination and of subsequent vehement protests he had received from Brazauskas's friends, including the assistant chairperson of Notre Dame's Department of Theology;

2. Subpoenaed phone records, which show that phone calls were exchanged between Notre Dame officials and Bishop D'Arcy's office during the time when Brazauskas was being considered for the Acting Director position;

3. Notre Dame officials justified the dissolution of the PCL by saying that a review committee had recommended that step, when evidence indicated that none of the members of the committee had suggested that the PCL should be dissolved;

4. Fr. Malloy at one time indicated that he had been involved in the decision to dissolve the PCL only because the University Provost was out of the country, when other evidence shows that he decided to eliminate the PCL several days before the Provost left;

5. Fr. Malloy denied being contacted by Fr. Martelli about Brazauskas's firing until he was shown the letter that Fr. Martelli had sent to him, and he denied any relationship with the Parish although he had served as honorary chairman of the Parish's fund-raising campaign; and

6. The Dean of Notre Dame's College of Science told a friend of Brazauskas that Bishop D'Arcy had personally intervened with Fr. Malloy regarding Brazauskas's application to the PCL, and had complained to Fr. Malloy that he was being personally attacked and vilified.[5]

The Diocese defendants respond that even if Fr. Martelli, Bishop D'Arcy or other high-ranking Diocese officials contacted Notre Dame officials while Brazauskas was under consideration for the Acting Director job, they did so pursuant to Catholic Church doctrine, and we may not inquire further.

---

**5.** The Diocese defendants vigorously refute this fact, claiming that the Dean never made this statement and that Brazauskas's friend erroneously attributed the statement to the Dean.

The Diocese defendants cite to a document issued by Pope John Paul II to address the role of Catholic universities in the Catholic Church. In this document, Pope John Paul II writes,

Bishops have a particular responsibility to promote Catholic universities, and especially to promote and assist in the preservation and strengthening of their Catholic identity, including the protection of their Catholic identity in relation to civil authorities. This will be achieved more effectively if close personal and pastoral relationships exist between universities and Church authorities characterized by mutual trust, close and consistent cooperation and consistent dialogue. Even when they do not enter directly into the internal governance of the university, bishops should be seen not as external agents but as participants in the life of the Catholic university.

POPE JOHN PAUL II, APOSTOLIC CONSTITUTION EX CORDE ECCLESIAE OF THE SUPREME PONTIFF 20 (St. Paul Books & Media 1991) (quotation omitted) ("Ex Corde Ecclesiae").

Ex Corde Ecclesiae also sets forth a number of "General Norms," which are based on the Catholic Church's Code of Canon Law and are to be "applied concretely" by Episcopal conferences and Catholic universities. *Id.* at 30. Article Five of the General Norms provides, in relevant part:

§ 1. Every Catholic university is to maintain communion with the universal Church and the Holy See; it is to be in close communion with the local Church and in particular with the diocesan bishops of the region or nation in which it is located. . . .

§ 2. Each bishop has a responsibility to promote the welfare of the Catholic universities in his diocese and has the right and duty to watch over the preservation and strengthening of their Catholic character.

*Id.* at 33–34. In addition, Article Six provides, in relevant part, "A sufficient number of qualified people—priests, religious, and lay persons—are to be appointed to provide pastoral ministry for the university community, carried on in harmony and cooperation with the pastoral activities of the local Church under the guidance or with the approval of the diocesan bishop." *Id.* at 34–35.

■ In the instant case, Fr. Martelli's November 4, 1992, letter to Fr. Malloy refers to letters of protest he had received from Brazauskas's friends, including Kern Trembath, the assistant chairperson of Notre Dame's theology department. In his letter, Fr. Martelli wrote that the letters "include charges and accusations so alarming in nature that I would be remiss not to bring them to your attention." Appellant's App., p. 945. Fr. Martelli's letter reflects an apparent intent to keep Fr. Malloy informed of events affecting both the Parish and Notre Dame. According to Ex Corde Ecclesiae, there should be "close and consistent cooperation and consistent dialogue" between university officials and Church authorities. EX CORDE ECCLESIAE at 20. Given Fr. Martelli's ecclesiastical encouragement to remain in contact with Notre Dame officials, we conclude that further inquiry into whether he engaged in blacklisting would require us to interpret his intent in relation to church doctrine, thereby violating the First Amendment. *See, e.g., Brazauskas I,* 714 N.E.2d at 263.

Turning to the Parish and the Diocese, assuming without deciding that Bishop D'Arcy or other Diocese officials contacted Fr. Malloy and other Notre Dame officials and urged them not to hire Brazauskas, we are of the opinion that the First Amendment bars further litigation of Brazaus-

kas's blacklisting claim against the Parish and the Diocese. Because Diocese officials and Notre Dame officials are commanded to remain "in close communion" with one another pursuant to Ex Corde Ecclesiae, the contacts have an ostensibly ecclesiastical basis. Ex Corde Ecclesiae at 33.

In addition, there is evidence that the Acting Director position that Brazauskas sought is a pastoral or ministerial position. Brazauskas testified that because she did not get the Acting Director job, her future involvement in church ministry was precluded because "there aren't many more opportunities in the Catholic church for that type of ministry in this area." Appellees' App., p. 1162. Ex Corde Ecclesiae provides that pastoral activities at a Catholic university are required to have the diocesan Bishop's approval or guidance, thereby further demonstrating that the Diocese officials' contacts also could have had a doctrinal basis. Ex Corde Ecclesiae at 34. Consequently, any further inquiry would require this court to scrutinize the Diocese defendants' behavior in connection with religious doctrine. See, e.g., Brazauskas I, 714 N.E.2d at 263. This we cannot do. See id.

Brazauskas asserts that the Diocese defendants are citing Ex Corde Ecclesiae and raising the defense of church doctrine as an after-the-fact rationalization of their allegedly illegal behavior. However, as we discussed in Brazauskas I, "the First Amendment prevents this Court from scrutinizing the possible interpretations of defendants' statements and their purported reasons for uttering them." Id. Consequently, the trial court lacked subject matter jurisdiction over Brazauskas's blacklisting claim, and it did not err when it dismissed this claim. See Id.

## II.

■ Turning to Brazauskas's claim for tortious interference with a business relationship, the elements of that tort are: 1) the existence of a valid relationship; 2) the defendant's knowledge of the existence of the relationship; 3) the defendant's intentional interference with that relationship; 4) the absence of justification; and 5) damages resulting from defendant's wrongful interference with the relationship. Bradley v. Hall, 720 N.E.2d 747, 750 (Ind.Ct.App.1999). Contrary to the parties' assertions, a plaintiff is not required to also plead illegal conduct in order to sustain this cause of action. See id. at 751.

■ Brazauskas refers to the same facts outlined in her blacklisting claim to support her tortious interference claim against the Diocese defendants. Once again, however, considering Fr. Martelli's letter and assuming without deciding that Diocese officials contacted Notre Dame officials about Brazauskas's application, we conclude that the Diocese defendants have presented ostensibly ecclesiastical justifications for their actions. As the Parish pastor on Notre Dame's campus, Fr. Martelli is encouraged to have "close and consistent cooperation and consistent dialogue" with Notre Dame officials. Ex Corde Ecclesiae at 20. Furthermore, Notre Dame is required to be in "close communion" with Bishop D'Arcy and other Diocese officials, and pastoral activities at Notre Dame must be carried on with Bishop D'Arcy's guidance or approval. See id. at 33–34. Therefore, because the Diocese defendants' actions had a possible doctrinal basis, the First Amendment forbids the courts from becoming involved in this ecclesiastical dispute. See Brazauskas I, 714 N.E.2d at 263; cf. Konkle, 672 N.E.2d at 456 (determining that the plaintiff's claims were not barred by the First Amendment because they did not involve any inquiry into religious doctrine or practice).

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

NAJAM, J. and RILEY, J. concur.