**Beverly M. BRAZAUSKAS, Appellant (Plaintiff below),**

v.

**FORT WAYNE–SOUTH BEND DIOCESE, INC., Sacred Heart Parish, and Jose Martelli, Appellees (Defendants below).**

No. 71S03–0205–CV–268.

Supreme Court of Indiana.

Sept. 25, 2003.

⊛84.5(1)

Stephen M. Terrell, Landman & Beatty, Indianapolis, IN, Edward N. Kalamaros & Associates, South Bend, IN, Attorneys for Appellant.

William T. Hopkins, Jr., Michael A. Scheer, Barnes & Thornburg, Fort Wayne, IN, Attorneys for Appellee.

SHEPARD, Chief Justice.

Appellant Beverly Brazauskas sued Father Jose Martelli and the Fort Wayne–South Bend Catholic Diocese for blacklisting and tortious interference with a business relationship. She claims that after Father Martelli terminated her employment at Sacred Heart Church, he and Bishop John D'Arcy of the Diocese prevented her from obtaining a position at the University of Notre Dame by truthfully informing University President Father Edward Malloy that Brazauskas was suing them over this termination decision.

We conclude that even if this scenario occurred as she describes, her suit fails under the First Amendment's Free Exercise Clause.

### Facts and Procedural History

Sacred Heart Parish, a part of the Diocese, is located on the campus of the University of Notre Dame near South Bend. In August 1992, Parish pastor Father Martelli dismissed Brazauskas from her position as Director of Religious Education and Liturgy at Sacred Heart Church.

Brazauskas sued the Diocese (which includes the Parish) and Father Martelli on a variety of grounds, including breach of contract, breach of the covenant of good faith and fair dealing, wrongful discharge, fraud, defamation, promissory estoppel, and infliction of emotional distress. All these claims were eventually dismissed in various proceedings.

While her employment lawsuit was pending, Brazauskas applied for a position as Acting Director of Notre Dame's Program for Church Leaders (PCL), a sabbatical program. In June 1993, a search committee recommended her for the job.

Father Malloy rejected the recommendation, believing that Notre Dame "should not hire someone who has an active lawsuit against the local bishop until that matter [is] resolved." (*Id.* at 422.) He explained, "I consider a[C]atholic university to desirably have a positive and respectful relationship to the [C]atholic church community, including the local bishop," and hiring someone who had a pending lawsuit "would be a gesture of ill will until such a matter was resolved by the courts." (*Id.* at 423.) [1]

This view is consistent with Ex Corde Ecclesiae, a 1990 directive of Pope John Paul II based on Roman Catholic canon law that addresses the relationship between Catholic universities and local diocesan bishops. Ex Corde Ecclesiae encourages "close personal and pastoral relationships between university and Church authorities characterized by mutual trust, close and consistent cooperation and continuing dialogue." (Appellant's App. at 1013.)

After she failed to receive the PCL position, Brazauskas added claims for blacklisting and tortious interference with a business relationship to her lawsuit against Father Martelli and the Diocese. See Ind. Code Ann. §§ 22–5–3–1, 2 (West 1991).[2] Brazauskas did not challenge Father Malloy's or Notre Dame's legal right to deny her the PCL position for the reason Father Malloy gave.

In February 2001, the trial court dismissed both of these claims for lack of subject matter jurisdiction. The Court of Appeals affirmed. *Brazauskas v. Fort Wayne–South Bend Diocese, Inc.*, 755 N.E.2d 201 (Ind.Ct.App.2001). We granted transfer, and now affirm, concluding that the trial court had jurisdiction over the matter but that the Diocese defendants were entitled to judgment on the merits.

### I. The Procedural Posture

■ As a preliminary matter, we address the appropriate procedure for seek-

---

1. Father Malloy also ordered dissolution of the PCL, and testified that he thought the program had already been eliminated. (Appellant's App. at 407.) Brazauskas has gone to lengths to try to prove that Father Malloy terminated the program "to implement the Bishop's desires that Beverly Brazauskas not be hired at Notre Dame." (Appellant's Br. at 13.) For reasons explained below this makes no difference to the resolution of this case.

2. The Diocese defendants correctly point out that the more appropriately styled claim would be tortious interference with prospective advantage. (Appellee's Br. at 22); *see Kiyose v. Trustees of Ind. Univ.*, 166 Ind.App. 34, 333 N.E.2d 886 (.1975).

ing dismissal of a suit by asserting a Free Exercise Clause defense.

In 1997, the trial court denied the Diocese defendants' motion for summary judgment on the tortious interference and blacklisting claims. On appeal of this ruling, the Court of Appeals noted *sua sponte* that the Diocese defendants should have challenged subject matter jurisdiction via motions to dismiss for lack of subject matter jurisdiction under Indiana Trial Rule 12(B)(1) rather than via summary judgment motions. *See Brazauskas v. Fort Wayne–South Bend Diocese, Inc.,* 714 N.E.2d 253, 259 (Ind.Ct.App.1999). Following that guidance, the Diocese defendants accordingly argue that the trial court lacked subject matter jurisdiction over the tortious interference and blacklisting claims under Rule 12(B)(1).

Other courts have resolved this procedural question differently. In *Bryce v. Episcopal Church,* 289 F.3d 648 (10th Cir. 2002), the Tenth Circuit dealt with an analogous claim brought by two church members claiming sexual harassment in the form of remarks made during parish meetings about homosexuals and the two members' homosexual activities. *Id.* at 651–53. The church responded that the remarks were part of ecclesiastical discussions on church policy, so the claims were barred. *Id.* at 651.

Applying rules of federal procedure, the Tenth Circuit treated the church's challenge as a Rule 12(B)(6) motion to dismiss for failure to state a sufficient claim. *Id.* at 654. It found no abuse of discretion by the trial court in considering evidence beyond the pleadings, thereby converting the motion to dismiss into a summary judgment motion, and affirmed judgment for the church. *Id.* at 654, 660. *See also McKelvey v. Pierce,* 173 N.J. 26, 800 A.2d 840, 844 (2002) (applying state rules of procedure and treating contract and tort suit by former seminarian claiming damages stemming from unwanted homosexual advances as motion for judgment on the pleadings that effectively became a summary judgment motion).

We agree with the approach taken by these two courts, and hold that the trial court erred in concluding that it lacked jurisdiction over this matter. A court with general authority to hear matters like employment disputes is not ousted of subject matter or personal jurisdiction because the defendant pleads a religious defense. Rather, pleading an affirmative defense like the Free Exercise Clause may under certain facts entitle a party to summary judgment.

■ We will proceed with our review using the standard applicable to summary judgment, as the trial court did not exclude matters submitted outside the pleadings. *See* Ind. Trial R. 12(B), 56. We will therefore consider whether there is any genuine issue of material fact and whether the Diocese defendants as the moving parties are entitled to judgment as a matter of law. T.R. 56. In doing so, we construe all facts and reasonable inferences in the light most favorable to Brazauskas as the nonmoving party. *See State Farm Fire & Cas. Co. v. T.B.,* 762 N.E.2d 1227 (Ind. 2002).

## II. The Changed Landscape of Blacklisting Law

Had these events occurred two years later, our disposition would be quite simple. In 1993, Indiana's blacklisting statute read about the same as it had upon initial enactment in 1889, namely:

A person who, after having discharged any employee from his service, prevents the discharged employee from obtaining employment with any other person commits a Class C infraction, and is liable in

penal damages to the discharged employee, to be recovered by a civil action; but this section does not prohibit a person from informing, in writing, any other person to whom the discharged employee has applied for employment, a truthful statement of the reasons for discharge.

If any railway company or any other company or partnership or corporation in this state shall authorize, allow or permit any of its or their agents to black-list any discharged employees, or attempt by words or writing, or any other means whatever, to prevent such discharged employee, or any employee who may have voluntarily left said company's service, from obtaining employment with any other person, or company, said company shall be liable to such employee in such sum as will fully compensate him, to which may be added exemplary damages.

Ind.Code Ann. §§ 22–5–3–1, 2 (West 1991).

In 1995, however, the General Assembly added an important exception:

An employer that discloses information about a current or former employee is immune from civil liability for the disclosure and the consequences proximately caused by the disclosure, unless it is proven by a preponderance of the evidence that the information disclosed was known to be false at the time the disclosure was made.

Ind.Code Ann. § 22–5–3–1(b) (West 2002).

Brazauskas does not claim that any of the alleged disclosures that led to her denial of the PCL position were false. She would therefore have no claim for blacklisting under the revised statute.

She would likewise not have a claim for tortious interference, because in Indiana this tort requires some independent illegal action. *See, e.g., Watson Rural Water Co., Inc. v. Ind. Cities Water Corp.,* 540 N.E.2d 131 (Ind.Ct.App.1989). Brazauskas' only other allegation of illegal conduct is the blacklisting claim (Appellant's Br. at 18) so both would fail with no need to reach the Diocese defendants' constitutional argument.

### III.  The Factual Premise

Notwithstanding subsequent legislative action, we must apply the statute as it existed in 1993. Brazauskas' complaint alleges that the Bishop and Father Martelli prevented her from obtaining employment at Notre Dame.[3] She bases her claim primarily on a letter Father Martelli wrote more than six months before she applied for the PCL job and on influence allegedly exerted by the Bishop that prompted Father Malloy to deny Brazauskas the position.

Father Martelli's writing was a response to two letters he received from one of Brazauskas' supporters, Notre Dame Theology Department Assistant Chairman Kern Trembath. In the first letter, Dr. Trembath accused Father Martelli of scandalizing the Church by firing Church employees, saying, "the fact that you are allowed to remain a priest is simply and strictly a measure of the worldwide shortage of priests." (Appellant's App. at 1082.) He described Father Martelli as "a bad priest, and ... not a cultural American." (*Id.*) Dr. Trembath and his wife followed up with a second letter a week later, threatening legal action on their own behalf and demanding "[c]omplete resolu-

---

**3.**  She also complains that the defendants prevented her from obtaining employment at any other Parish or Catholic institution in the Diocese, but this complaint is waived for lack of argument that she sought or was denied any such positions. *See* Ind. Appellate. Rule 46(A)(8)(b).

tion of Beverly Brazauskas' issue against you to the satisfaction of her and her attorney." (*Id.* at 1083.)

In early November, Father Martelli sent copies of these letters to Father Malloy, along with his own letter saying that the Trembath letters "include charges and accusations so alarming in nature that I would be remiss not to bring them to your attention." (*Id.* at 1081.) Martelli's letter mentioned Brazauskas only to explain that her termination had precipitated this verbal assault, and did not criticize her or her actions. (*Id.*) Father Martelli stated that he was writing "for your information and not with the intent of causing more trouble for anyone." (*Id.*) He copied the correspondence to Bishop D'Arcy, among others.

Brazauskas does not explain how such a letter could support a reasonable inference that by making others aware of Trembath's accusations Father Martelli prevented her from getting the PCL position.

Her allegations against the Bishop are on similarly shaky factual ground. Both Bishop D'Arcy and Father Malloy deny that they ever discussed the PCL position, much less Brazauskas' candidacy. (Appellant's App. at 139–40, 422–24.) Brazauskas says she can prove otherwise, through circumstantial evidence such as records of telephone calls between the Bishop and Father Malloy's office. (*See* Appellant's Br. at 9–10.) The evidence she offers is at most marginally sufficient to raise a genuine issue of material fact, but for reasons explained below her claim would fail in any event.

### IV. Ex Corde Ecclesiae

■ The Diocese defendants successfully argued to the trial court and Court of Appeals that they lacked jurisdiction because secular review of Brazauskas' claims would constitute excessive entanglement and violate the Free Exercise clause of the First Amendment of the U.S. Constitution, which is applicable to the states through the Fourteenth Amendment. *Brazauskas,* 755 N.E.2d at 207–08.[4] They likewise urge us to hold that Ex Corde Ecclesiae forecloses court inquiry because under the First Amendment courts may neither interpret such documents nor penalize the practice of religion in fulfillment of the provisions of such a document. (Appellees' Br. at 40.)

This argument is somewhat circular. We cannot simply accept that Ex Corde Ecclesiae governed the alleged action without some review of the document. *See Draskovich v. Pasalich,* 151 Ind.App. 397, 401, 280 N.E.2d 69, 72 (1972) ("Notwithstanding the limitations imposed on the civil courts ... the civil courts can (and indeed must in some cases) look at ecclesiastical documents and related evidence concerning religious rites, doctrines, polity and practices for the limited purpose of determining the nature of the church organization.")

We also cannot accept without question an assertion that the courts may not review the legality of an action because that action was pursuant to a directive from higher church authority. *See Employment Div. v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). In *Smith,* the plaintiffs ingested peyote during a sacramental ceremony of their Native American Church. *Id.* at 874, 110 S.Ct. 1595. They were consequently fired from their jobs at a drug rehabilitation organization and denied unemployment benefits. *Id.*

---

4. They make no claim under the Indiana Constitution, so we do not address its applicability to the case.

The Supreme Court upheld the denial of benefits, holding that the Free Exercise Clause does not exempt religiously motivated action from neutral laws of general applicability. *Id.* at 881–82, 890, 110 S.Ct. 1595. Therefore, under *Smith*, church directives such as Ex Corde Ecclesiae are not the end of the story, because they do not automatically insulate the faithful from such neutral laws of general applicability as Indiana's blacklisting statute.

This is not to say that Ex Corde Ecclesiae is wholly irrelevant to this case. It establishes that higher church authority (namely, the Pope) has directed Catholic universities such as Notre Dame and local Catholic diocese officials to cooperate closely, communicate, and develop an environment of mutual trust. Bishop D'Arcy and other diocesan personnel would therefore be acting in accordance with ecclesiastical directive in keeping Father Malloy apprised of diocesan developments, including pending lawsuits, and in coordinating with him on administrative and policy matters.

## V.  The Church Autonomy Doctrine After Smith

■ There is an important and relevant limitation in the *Smith* decision. Justice Scalia specifically noted that the case presented "a free exercise claim unconnected with any communicative activity." *Id.* at 882, 110 S.Ct. 1595. Here, in contrast, the challenged activity was communicative.[5]

■ *Smith* is distinguishable in another important respect, because it did not implicate the church autonomy doctrine. This doctrine deals with a church's First Amendment right to autonomy in "making decisions regarding [its] own internal affairs," including matters of faith, doctrine, and internal governance. *Bryce*, 289 F.3d at 655.

The *Bryce* court cited *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952), in which the Supreme Court applied the First Amendment and struck down a statute that reassigned control over a cathedral among church officials. In *Kedroff*, the Court said that religious freedom encompasses "an independence from secular control or manipulation, in short, power [of churches] to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Id.* at 116–17, 73 S.Ct. 143.

The Tenth Circuit concluded, and we agree, that "[t]he Supreme Court's decision in *Employment Division v. Smith* ... does not undermine the principles of the church autonomy doctrine." *Bryce*, 289 F.3d at 656. *See also EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 462 (D.C.Cir. 1996) (Free Exercise clause forbids governmental action that encroaches on a church's ability to manage its internal affairs).

This doctrine does, of course, have limits. As the New Jersey Supreme Court recently said, "The First Amendment does

---

5.  In her complaint Brazauskas alleges, despite Bishop D'Arcy's deposition testimony that he had "no clout" in employment-related matters at Notre Dame, that the Diocese exercised "abuse of power ... undue influence and/or duress" in preventing her employment as PCL director. (Appellee's App. at 20, 142; Appellant's Br. at 8.) Brazauskas supports this contention only by asserting that Ex Corde Ecclesiae, which calls only for coopera-

tive effort, gives the Bishop authoritative influence over Notre Dame. (Appellant's Br. at 8, n. 2.) This is not enough to support a reasonable inference that the Bishop controlled the decision regarding Notre Dame's PCL director, but even assuming that he did exercise decisive influence over this undisputedly legal action, our conclusion would be the same.

not immunize every legal claim against a religious institution and its members. The analysis in each case is fact-sensitive and claim specific, requiring an assessment of every issue raised in terms of doctrinal and administrative intrusion and entanglement." *McKelvey*, 800 A.2d at 844 (finding genuine issues of material fact as to whether former seminarian's claim that unwanted homosexual advances damaged his career prospects could be litigated without offending First Amendment principles).

■■ Brazauskas would have us apply the blacklisting statute and tort law to penalize communication and coordination among church officials (all answerable to higher church authority that has directed them to work cooperatively) on a matter of internal church policy and administration that did not culminate in any illegal act. Such a holding would violate the church autonomy doctrine and run counter to the Court's declaration in *Cantwell v. Connecticut*, 310 U.S. 296, 307, 60 S.Ct. 900, 84 L.Ed. 1213 (1940): "The fundamental law declares the interest of the United States that the free exercise of religion be not prohibited and that freedom to communicate information and opinion be not abridged." [6]

We therefore conclude that under these facts the Free Exercise Clause entitles the defendants to summary judgment on Brazauskas' blacklisting claim. Her tortious interference claim fails for similar reasons, as well as the fact that she has not proven any illegal conduct by the Diocese defendants.

### Conclusion

We reverse dismissal of the case for lack of subject matter jurisdiction, and remand for entry of summary judgment in favor of the Diocese defendants.

DICKSON, BOEHM, and RUCKER, JJ., concur.

SULLIVAN, J., concurs in part and dissents in part with separate opinion.

SULLIVAN, Justice, concurring in part and dissenting in part.

I agree with the majority that the trial court had jurisdiction and that Plaintiff's allegations of blacklisting and interference are "at most marginally sufficient to raise a genuine issue of material fact." Maj. Op. at 7. But I disagree that the Diocese is entitled to summary judgment as a matter of law.

*Employment Div. v. Smith*, 494 U.S. 872, 881, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), announced that the First Amendment rarely "bars application of a neutral, generally applicable law to religiously motivated action." The Indiana blacklisting statute and common law tort of interference with prospective advantage at issue here are neutral laws of general applicability. The majority holds that, notwithstanding *Smith*, the Diocese is entitled to summary judgment as a matter of law for two reasons. First, the majority finds that the challenged activity here was "communicative" and that *Smith* contains an exception to its general rule for Free Exercise claims connected with "communicative

---

**6.** This is not to say that the Free Exercise Clause would prevent prosecution for an agreement with another person to commit a felony, even if that other person is another church member or official and the agreement implicates ecclesiastical issues, if the state also proves an overt act in furtherance of that agreement in accordance with Indiana's conspiracy statute. *See* Ind.Code Ann. § 35–41–5–2 (West 2001). For example, a defendant charged with conspiracy to commit murder via terroristic attacks could not insulate himself from liability merely by claiming that the agreement element of the crime occurred within a protected discussion of church doctrine or policy.

activity." Second, the majority finds that the challenged activity here is protected by the "church autonomy doctrine" that survived *Smith.*

As to the communicative activity defense, the phrase from *Smith* cited by the majority is part of a larger discussion in which the Supreme Court stated its precedents could not be read to allow individuals to engage in otherwise prohibited conduct merely because the conduct is accompanied by religious conviction. *See Smith,* 494 U.S. at 882, 110 S.Ct. 1595 (" 'Our cases do not at their farthest reach support the proposition that a stance of conscientious opposition relieves an objector from any colliding duty fixed by a democratic government.' ") (quoting *Gillette v. United States,* 401 U.S. 437, 461, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971)). As such, it does not establish an exception from *Smith's* general rule for all communicative activity. At most, the term "communicative activity" encompasses merely that communicative activity that is protected by constitutional provisions other than the Free Exercise Clause. *Smith,* 494 U.S. at 881–82, 110 S.Ct. 1595 (discussing prior cases). In my view, the "communicative activity" that forms the basis of Brazauskas's claims does not meet this standard.[1]

As to the church autonomy doctrine defense, the Supreme Court has not yet had occasion to make clear whether this doctrine survived *Smith.*[2] I find it hard to reconcile *Smith* with the doctrine's continued vitality, at least as applied to the facts of this case.

*Smith* held to be constitutional a law banning the sacramental use of peyote be-

cause the law was both neutral and generally applicable. 494 U.S. at 878–82, 890, 110 S.Ct. 1595. A central concern behind *Smith's* neutrality principle is the notion that a private right to ignore neutral and generally applicable laws is, and should remain, a constitutional anomaly. *See Smith,* 494 U.S. at 879, 885, 110 S.Ct. 1595. The arguments used to support the neutral and generally applicable standard cut against the continued vitality of the church autonomy defense. Mere religious belief has never been a cognizable shield "from compliance with an otherwise valid law prohibiting conduct the State is free to regulate." *Smith,* 494 U.S. at 879, 110 S.Ct. 1595. Indeed, in the few cases where the U.S. Supreme Court applied the church autonomy defense, the law in question was neither neutral nor generally applicable. *See Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in N. Am.,* 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952) (invalidating 1925 New York statute that effectively put the Russian Orthodox churches of New York under the administration of the Russian Church in America).

Even if the church autonomy defense survived *Smith,* I do not believe it bars Brazauskas's claim.

The church autonomy doctrine prohibits the government from "lend[ing] its power to one or the other side in controversies over religious authority or dogma." *Smith,* 494 U.S. at 877, 110 S.Ct. 1595. Since its inception, the doctrine has resonated most strongly in cases involving members of the clergy because these are the cases that run the greatest risk of

---

1. None of the majority, Brazauskas, or the Diocese appear to suggest that the disputed communicative activity would be constitutionally protected absent the claim of religious conviction.

2. I acknowledge the majority's citations to two federal Courts of Appeal that have so held. *Bryce v. Episcopal Church,* 289 F.3d 648 (10th Cir.2002); *EEOC v. Catholic Univ. of Am.,* 83 F.3d 455 (D.C.Cir.1996).

forcing the government to take sides in a factional religious dispute. But courts have not used the Free Exercise Clause to bar claims by non-ministerial employees of a religious institution. *See* Shawna Meyer Eikenberry, Note, *Thou Shalt Not Sue the Church: Denying Court Access to Ministerial Employees,* 74 Ind. L.J. 269, 276 (1998).

Moreover, the church autonomy defense does *not* prohibit a state court from resolving church disputes if the court can and does resort to neutral principles of law and applies them in a secular fashion. *See Jones v. Wolf,* 443 U.S. 595, 602–04, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979) (analyzing church property dispute by using neutral principles of law). This is because in so doing, a state court avoids making determinations of the underlying religious dispute.

In the present case, Brazauskas claims that certain individuals unlawfully denied her the opportunity to work at a university. Neither party suggested, as the church autonomy defense has traditionally required, that her prospective position would have involved ministerial-type duties. To the extent that Brazauskas's claim can be characterized as a religious dispute at all, the church autonomy defense does not bar a claim where neutral principles of law are available to resolve the case. The Indiana blacklisting statute and the tort of interference with prospective advantage are religiously neutral and generally applicable. Far from advantaging any particular religious faction or group, the laws provide for the general welfare by protecting an open and free market of labor in all spheres. The Legislature could have accommodated custom by providing an exception to the law but it did not. Neither the Indiana blacklisting statute nor the tort of interference with prospective advantage benefits any one religious faction over any other. And just as there was no contention in *Smith* that the Oregon drug law was "an attempt to regulate religious beliefs," neither is there any similar contention here. *See Smith,* 494 U.S. at 882, 110 S.Ct. 1595.