MATHIAS, Judge
dissenting.
I respectfully dissent.
I believe that we are constrained to affirm the jury verdict in this case under our standard of review and because of the unique location in which Mr. Semenick’s disruptive behavior took place.
Mr. Semenick’s appeal is from a jury verdict. Our standard of review regarding a jury verdict requires us to consider only the facts most favorable to that verdict, along with any reasonable inference that the jury could have drawn from those facts. McHenry v. State, 820 N.E.2d 124, 126 (Ind.2005). We must respect the jury’s exclusive province to weigh conflicting evidence, and we should therefore neither reweigh the evidence nor judge witness credibility. Id. We must also recognize the province of the jury to disregard undisputed testimony. Griffin v. State, 493 N.E.2d 439, 443 (Ind.1986); Morphew v. Morphew, 419 N.E.2d 770, 777 (Ind.Ct.App.1981). What follows are the facts that I believe support the jury’s verdict.
On the morning in question, Manual Halbert (“Halbert”), who is a retired Special Deputy Sheriff for the Indianapolis Department of Public Works and uses a wheelchair as a result of his diabetes, was serving as a volunteer greeter at Lakeview Christian Church in Indianapolis (“the Church”). When Mr. Semenick entered the Church that morning, Halbert greeted him but received no response. As the services began, Halbert moved inside the entrance to the sanctuary, which seats approximately 2,000, to greet those who entered the sanctuary. Halbert began to speak with Jennifer Crittendon (“Critten-don”), a Deputy Sheriff employed by the Church to provide security for the Church during services. Shortly thereafter, Mr. Semenick, who was seated nearby in the back of the sanctuary, approached Halbert and Crittendon and told them to “shut up.” Tr. p. 26. Crittendon then left the sanctuary area, and Halbert began to speak with another churchgoer, James Martin (“Martin”). Mr. Semenick turned around in his seat, glared at Halbert and Martin and told them that they were “making too much noise.” Tr. pp. 26-27.
Mr. Semenick then left his seat in the sanctuary to look for Don Henry (“Henry”), who was the head usher and supervisor of the door greeters, to complain about people making too much noise. Henry assumed Mr. Semenick was complaining about other parishioners, but when he went with Mr. Semenick into the sanctuary, Mr. Semenick pointed at Halbert and Martin and stated, “these guys need to *13 shut up.” Tr. p. 60. Henry informed Mr. Semenick that Halbert was one of the greeters and that it was his job to welcome people to the Church. He also told Mr. Semenick that he would hear the door greeters if he sat in the back of the Church. Martin attempted to apologize for disturbing Mr. Semenick, and extended his hand toward Mr. Semenick. This caused Mr. Semenick to yell or shout[8] at Martin, “don’t touch me,” and “get your hand off me.” Tr. pp. 38, 72. Martin had “never seen that much anger in one person,” and was of the opinion that Mr. Semenick “created ... a clear and present danger.” Tr. p. 60. Mr. Semenick’s loud voice caused several people in the front of the sanctuary to turn around and look back.
Concerned that Mr. Semenick was causing or about to cause a disturbance in the sanctuary, Halbert left the sanctuary and flagged down Sergeant John Dierdorf (“Sgt. Dierdorf’) of the Town of Clermont Police Department, who worked as a security guard for the Church. Sgt. Dierdorf was in full uniform and was at that time speaking with Officer Kevin Brown (“Officer Brown”) of the Indianapolis Metropolitan Police Department. Halbert informed Sgt. Dierdorf of Mr. Semenick’s behavior. Sgt. Dierdorf stated that Halbert was extremely upset and “almost in tears,” which was uncharacteristic for Halbert. Tr. p. 102.
Sgt. Dierdorf then followed Halbert back into the sanctuary. As Halbert was informing him of what had happened, but before he had pointed to Mr. Semenick as the person involved, Sgt. Dierdorf noticed Mr. Semenick “fidgeting in his seat, looking behind him ... in an agitated mode,” as if “he was angry at whatever noise was going on around him.” Tr. pp. 103, 110. Sgt. Dierdorf wanted to “deescalate the situation” and approached Mr. Semenick in his seat and asked him to gather his belongings and step outside the sanctuary with Sgt. Dierdorf. Tr. p. 103. Mr. Sem-enick asked if he was under arrest, and when told that he was not, he refused to leave the sanctuary. Sgt. Dierdorf then informed Mr. Semenick that he had to leave the sanctuary on his own or Sgt. Dierdorf would “help him stand up and make him leave.” Tr. p. 104. Mr. Semen-ick then left the sanctuary with Sgt. Dier-dorf.
As he escorted Mr. Semenick out of the sanctuary and into the lobby, Sgt. Dierdorf told Mr. Semenick he needed to leave the Church. Instead of directly leaving the Church, Mr. Semenick approached Henry, who was also in the Church lobby at this time, and told him to “explain to these cops ... what was going on.” Tr. p. 73. Henry again told Mr. Semenick that the door greeters had to welcome people and that Mr. Semenick would hear them talking from where he was seated. Mr. Sem-enick asked Henry, “what are these rent-a cops doing here?” Tr. p. 73. Henry informed him that the police were there “by *14 church’s orders.” Id. Mr. Semenick then stated that the officers, whom he again referred to as “rent-a-cops,” could not do anything to him. At this point Mr. Semen-ick was again being loud, causing people in a nearby cafe area of the church to stop and look at the disturbance. Sgt. Dierdorf then placed Mr. Semenick in handcuffs and took him outside the Church.[9]
Discussion and Decision
To me, the resolution of this case is dictated by our well-settled standard of review. When reviewing a claim of insufficient evidence, in the case of a jury verdict, we consider only the facts most favorable to that verdict, along with any reasonable inference that the jury could have drawn from those facts. McHenry, 820 N.E.2d at 126. Respecting the jury’s exclusive province to weigh conflicting evidence, we neither reweigh the evidence nor judge witness credibility. Id. We must affirm the jury’s verdict if the probative evidence and reasonable inferences drawn from the evidence could have allowed a jury to find the defendant guilty beyond a reasonable doubt. Id.
In Lyles v. State, our supreme court summarized the elements of criminal trespass as follows:
“[T]he State must prove that the defendant (1) knowingly or intentionally (2) refused to leave (3) the real property (4) of another person (5) after having been asked to leave (6) by the person or the person’s agent (7) when such defendant lacked a contractual interest in the real property.”
970 N.E.2d 140, 142-43 (Ind.2012) (citing Ind.Code § 35-43-2-2(a)(2)).
Applying our standard of review, I conclude that the State presented sufficient evidence from which the jury could reasonable conclude that Mr. Semenick, not having a contractual interest in the property at issue, knowingly or intentionally refused to leave the real property of the Church after having been asked to leave by an agent of the Church.
A. Agent of the Church
First, I believe that the State presented sufficient evidence to prove that Mr. Sem-enick was asked to leave by the Church or an agent of the Church. Although “the property owner” did not testify, the State did present evidence that Sgt. Dierdorf was hired by the Church and was under the orders of the Church to act as a security officer. The majority claims that Sgt. Dierdorf was given authority only to patrol the parking lot. It is true that Sgt. Dier-dorf testified that he was patrolling the parking lot when he was called into the church to deal with the escalating situation involving Mr. Semenick. But he also testified that although he was typically outside during the first service, he would be inside the Church building during the second service. Thus, it is apparent that his authority extended beyond simply patrolling the parking lot and including acting as a security officer inside the Church building itself.
I think the jury could reasonably conclude that part of Sgt. Dierdorfs powers as a security officer was to ask anyone causing a disturbance to leave the Church premises. Indeed, Sgt. Dierdorf would be a distinctly ineffectual security officer if he were without authority to ask those causing a disturbance to leave the Church. In fact, Mr. Semenick’s own reference to Sgt. Dierdorf as a “rent-a-cop” strongly suggests that Mr. Semenick himself understood that Sgt. Dierdorf was hired by the Church to act as a security officer.
*15 I find Mr. Semenick’s citation to Glispie v. State, 955 N.E.2d 819 (Ind.Ct.App.2011), unavailing. In that case, this court held that the testimony of a police officer that he could act as an agent of the property owner was insufficient to establish that the officer was in fact such an agent because “[i]t is a well-established rule that agency cannot be proven by the declaration of the agent alone.” Id. at 822 (citing United Artists Theatre Circuit, Inc. v. Ind. Dep’t of State Revenue, 459 N.E.2d 754, 758 (Ind.Ct.App.1984)). In Glispie, the State offered no other evidence indicating that the police officer had any authority to act on behalf of the property owner.
Here, however, Sgt. Dierdorf s testimony was not the only evidence of his agency for the Church. Indeed, Henry testified that Sgt. Dierdorf and the other security officers were there “by church’s orders.” Tr. p. 73. And, as indicated above, Mr. Semenick’s own”rent-a-cop” statements indicate that he understood that Sgt. Dier-dorf was hired by the Church to act as a security guard. From this, I believe that the jury could reasonably conclude that Sgt. Dierdorf was an agent of the Church who had the authority to ask anyone causing a disturbance on Church property, such as Mr. Semenick, to leave the Church.
B. Lack of a Contractual Interest in the Real Property of the Church
I also disagree with Mr. Semenick’s claim the State failed to prove that he did not have a contractual interest in the church property. See I.C. § 35-43-2-2(a)(2). “A ‘contractual interest in the property’ is a right, title, or legal share of real property arising out of a binding agreement between two or more parties.” Lyles, 970 N.E.2d at 143 n. 3. In proving the lack of a contractual interest, the State need not disprove every conceivable contractual interest that a defendant might have in the real property at issue. Id. at 143-44. Otherwise, the State would face a potentially impossible burden to identify and refute every possible contractual interest a defendant might have in the property, which is more than due process requires. Id. at 144. Thus, some contractual interests need not be disproven because they do not create any reasonable doubt that a defendant lacks a contractual interest in the property. Id. “For this reason, the State satisfies its burden when it disproves those contractual interests that are reasonably apparent from the context and circumstances under which the trespass is alleged to have occurred.” Id.
Here, the only possible contractual interest that is reasonably apparent from the context and circumstances under which the trespass was alleged to have occurred is that of a parishioner or member of the Church. Mr. Semenick claims that the State failed to prove his lack of a contractual interest in the church premises because there was no testimony from the property owner directly stating that he had no such interest or documentary proof to the same effect. This characterizes the State’s burden too strongly. The State need not present direct evidence to support each element of a crime, and it has long been held that circumstantial evidence will support a conviction. See Maul v. State, 731 N.E.2d 438, 439 (Ind.2000).
The majority states that Mr. Semenick was a “longtime contributor, participant, and believer.” Op., supra, at 10. It is true that Mr. Semenick testified that he had regularly attended the Church for over twenty years and that the Church considered him a “regular member,” even though he had no formal membership. He also testified that he had sent his children to school at the Church. The majority wholly credits Mr. Semenick’s testimony. Our *16 constitution and common law make it the province of the jury, and not a court on appeal, to determine the credibility of such testimony. Ind. Const, art. 1, sec. 19 (“In all criminal cases whatever, the jury shall have the right to determine the law and the facts.”); McHenry, 820 N.E.2d at 126. Here, the jury could have simply discredited Mr. Semenick’s claims regarding his membership at the Church. See Griffin v. State, 493 N.E.2d 439, 443 (Ind.1986) (noting that jury apparently disbelieved defendant’s allegedly uncontroverted evidence that he was in another state at the time the crime at issue was committed); Morphew v. Morphew, 419 N.E.2d 770, 777 (Ind.Ct.App.1981) (noting that uncontro-verted evidence is not necessarily binding on the trier of fact and may be disbelieved and given no weight).
But even if we accept Mr. Semenick’s testimony at face value, and even if Mr. Semenick was a member or regular parishioner of the Church, I cannot agree that his status as such created a “right, title, or legal share of real property arising out of a binding agreement between” Mr. Semen-ick and the Church. Lyles, 970 N.E.2d at 143 n. 3. (emphasis added). Lyles is instructive both on the issue of the nature of underlying agreements and the limitations of any interest in real property they might create.
In Lyles, the defendant, a bank customer, became “irate and disrespectful” after being informed by the bank manager that he could not obtain an account statement for free. 970 N.E.2d at 142. When the defendant refused the manager’s request to leave the bank, the manager called the police. The responding officer arrested the defendant after asking him to leave multiple times. On appeal, the defendant claimed that the State failed to prove that he did not have a contractual interest in the bank given his status as a bank customer. Our supreme court disagreed, noting that there was evidence that “the defendant was neither an owner nor an employee of the bank as well as evidence that the bank manager had authority to ask customers to leave the bank premises.” Id. at 143. This evidence, the court held, “refuted each of the most reasonably apparent sources from which a person in the defendant’s circumstances might have derived a contractual interest in the bank’s real property: as an owner, as an employee, and as an account holder.” Id,.
Thus, Lyles stands for the proposition that even a bank account holder, a person who actually has a written contract with the bank governing his deposits, has no right to remain on bank property after being asked to leave by someone with authority to make such a request or demand. Here, there is no suggestion that Mr. Sem-enick was an owner of the Church premises or that he was an employee of the Church. Only his status as a Church member or parishioner could have given him any right to be at the Church. Although there was no direct evidence that Sgt. Dierdorf was authorized to ask Church members to leave the church, the jury could, and apparently did, reasonably infer from all of the evidence that Sgt. Dierdorf, an off-duty police officer hired by the Church to act as a security officer for the Church, had such authority.
C. Disruptive Behavior May Terminate Limited Contractual Interest
Moreover, even someone like Mr. Sem-enick, with a limited right to come upon certain real property, may lose this right based on her or his behavior. This court concluded as much in Taylor v. State, 836 N.E.2d 1024, 1027 (Ind.Ct.App.2005), where we stated that “if a student has a contractual interest in school property, that interest is not unlimited and can be *17 violated by the student’s conduct.” In Taylor, the student convicted for criminal trespass was roaming around the building over two hours after his classes had ended, even after being told to wait in the front entry for a bus. The student then refused a school police officer’s directions to leave the school premises. This evidence was sufficient to prove that the student “did not have a contractual interest in the school property where and when he was asked to leave the premises.” Id.
The same could be said here; even if Mr. Semenick had a limited right to be on the Church’s property, he lost this limited right through his disruptive behavior. See id.; see also A.E.B. v. State, 756 N.E.2d 536, 541 (Ind.Ct.App.2001) (holding that State presented sufficient evidence to establish that student abandoned whatever contractual interest she had in school property where her disruptive behavior rose to the level of disorderly conduct).
D. The Location of the Disruptive Behavior: a Sunday Worship Service
Perhaps just as important as our standard of review regarding jury verdicts is the location of Mr. Semenick’s disruptive behavior, in the sanctuary of a church during an ongoing, Sunday worship service. What is disruptive behavior in one context might not rise to the level of disruptive behavior in another context. See Price v. State, 622 N.E.2d 954, 964 (Ind.1993) (noting that “noise made during normal sleeping hours may be a nuisance, while the same or even greater noise during the day would not.”); Johnson v. State, 719 N.E.2d 445, 448 (Ind.Ct.App.1999) (noting that, in context of disorderly conduct, the State must prove that the defendant produced noise that was “too loud for the circumstances.”).
Thus, while Mr. Semenick’s actions might have been within the bounds of acceptable behavior at a loud, outdoor event, I cannot ignore, and the jury did not ignore, the fact that his actions occurred in the sanctuary of a church. Even though there was some indication that the Church had services that were relatively energetic, Mr. Semenick was angry, rude and, most importantly in the context of his actions, loud. In fact, Mr. Semenick was loud enough to cause people at the front of the Church, during a service that included loud music, to turn around and look at the confrontation when he told Martin not to touch him. He was also loud enough in the lobby of the Church while talking to Henry that people in a nearby Church cafe area stopped to see what was going on.
I believe that this level of disruption on a church premises during its Sunday worship service was sufficient to terminate any limited right Mr. Semenick might have had to be on the Church premises as a member or parishioner. That the jury acquitted Mr. Semenick of disorderly conduct is of no moment or relevance to the task of determining whether the probative evidence and reasonable inferences drawn from the evidence adduced at trial and most favorable to the verdict could have allowed a jury to find Mr. Semenick guilty of criminal trespass beyond a reasonable doubt. See Beattie v. State, 924 N.E.2d 643, 648-49 (Ind.2010) (noting that jury verdicts are not subject to appellate review on grounds that they are inconsistent and noting that the only task for the court on appeal is to review the sufficiency of the evidence supporting the jury’s verdict); McNeill v. State, 936 N.E.2d 358, 360 (Ind.Ct.App.2010) (noting that “the inner workings of juries are unknown, [and] jurors could return inconsistent verdicts for a variety of reasons, such as lenity or compromise.”); McHenry, 820 N.E.2d at 126 (setting forth standard of review for claims of sufficiency of the evidence). Thus, the *18 jury’s acquittal of Mr. Semenick on the charge of disorderly conduct should have no impact on our review of the sufficiency of the evidence to support his conviction for criminal trespass. See Beattie, 924 N.E.2d at 648-49.
E. Refusal to Leave
The State also presented sufficient evidence to show that Mr. Semenick refused to leave after being asked to do so by an agent of the church. Sgt. Dierdorf testified that he asked Mr. Semenick to leave the church both before and after Mr. Sem-enick spoke with Henry in the church lobby. Instead of leaving, Mr. Semenick challenged Sgt. Dierdorfs authority. Indeed, Sgt. Dierdorf testified that when he asked Mr. Semenick to leave, Mr. Semen-ick responded, “I’m not leaving.” Tr. p. 106. This clearly shows that Mr. Semen-ick refused to leave after being asked to do so by Sgt. Dierdorf.
Thus, I believe that the evidence favorable to the verdict, and the reasonable inferences to be drawn therefrom, would allow a reasonable trier of fact to conclude that Mr. Semenick knowingly[10] refused to leave the church premises after being asked to leave by an agent of the church and that Mr. Semenick lacked a contractual interest in the property. This is sufficient to support his conviction for criminal trespass under Indiana Code section 35-43-2-2(a)(2).
F. First Amendment
Lastly, I reject Mr. Semenick’s claim that the evidence is insufficient to support his conviction in that the State failed to prove that it had “a compelling interest requiring Mr. Semenick to be removed from the worship service at Lakeview against his natural right to worship[.]” Appellant’s Br. p. 47. Consideration of Mr. Semenick’s alleged natural right to worship is not a statutory element of the crime of criminal trespass. I therefore take Mr. Semenick’s argument to be that his arrest violated his First Amendment right to the free exercise of religion.
But even so, Mr. Semenick did not move to dismiss the charges against him based on this alleged constitutional violation. See Baumgartner v. State, 891 N.E.2d 1131, 1135-36 (Ind.Ct.App.2008) (noting that the failure to file a motion to dismiss raising a Constitutional challenged waives the issue on appeal). Nor is there any indication that Mr. Semenick ever presented this constitutional argument to the trial court. I therefore consider this argument waived for being presented for the first time on appeal. See Whitfield v. State, 699 N.E.2d 666, 669 (Ind.Ct.App.1998) (noting that an argument raised for the first time on appeal is waived and will not be considered by appellate court) (citing Goodner v. State, 685 N.E.2d 1058, 1060 (Ind.1997)).[11]
Conclusion
Under the applicable standard of review for claims challenging the sufficiency of *19 the evidence supporting a jury verdict, I conclude that the State presented sufficient evidence that Sgt. Dierdorf was an agent of the Church and that Mr. Semen-ick had no contractual interest in Church premises. And even if Mr. Semenick had some limited right to be on the Church premises, I believe his disruptive behavior terminated that limited right. I am also of the opinion that there was sufficient evidence demonstrating that Mr. Semenick refused to leave the Church premises after being asked to do so by Sgt. Dierdorf. In short, I believe that the evidence presented at trial was sufficient to support the jury’s conviction of Mr. Semenick’s for criminal trespass. I therefore respectfully dissent from the majority’s opinion reversing that conviction.

. The majority takes issue with the characterization of Mr. Semenick's behavior as "yelling,” choosing to characterize the words he used as an order, rather than characterizing the level or tone of voice that he used, as well. Witness Manuel Halbert agreed with the term, "yell,” and witness Donald Hemy testified that he only heard Mr. Semenick "yell or shout” when he "told James [Martin] to get his hands off of him.” See Tr. pp. 42-43, 77. The majority claims that characterizing Mr. Semenick's behavior as a yell or a shout "over-dramatiz[es]” Mr. Semenick’s behavior "given that there was conflicting evidence as to any level of disruption.” Op., supra, pp. 8-9. I disagree. There is conflicting evidence in every trial, and it was the sole province of the jury to weigh any conflicting testimony. McHenry, 820 N.E.2d at 126. On appeal, our role is to consider only the evidence that favors the jury’s verdict. Id.

. A subsequent inventory search of Mr. Sem-enick’s car revealed several rifles.

. Mr. Semenick's argument that he had a bona fide belief that he was rightfully remaining on church premises is little more than a request that this court reweigh the evidence considered by the jury and come to a conclusion that he did not act knowingly or intentionally, which is of course contrary to our standard of review.

. Waiver notwithstanding, I would note that Mr. Semenick’s criminal behavior cannot be justified on First Amendment grounds, as the criminal trespass statute is a neutral law of general applicability. See Brazauskas v. Fort Wayne-South Bend Diocese, Inc., 796 N.E.2d 286, 292-93 (Ind.2003) (noting that the Free Exercise Clause does not exempt religiously motivated action from neutral laws of general applicability) (citing Emp’t Div. v. Smith, 494 U.S. 872, 881-82, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)).