

FILED

Jul 27 2023, 8:28 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Paul E. Harold
Stephen M. Judge
SouthBank Legal
South Bend, Indiana

Karen Lynch Conway
Conway Law, LLC
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Jesse R. Drum
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Freeman Hochstetler, Willard
Yoder, and Joe Hochstetler,

*Appellants-Defendants,*

v.

State of Indiana,

*Appellee-Plaintiff.*

July 27, 2023

Court of Appeals Case No.
22A-CR-2154

Appeal from the Elkhart Superior
Court

The Honorable David Bonfiglio,
Judge

Trial Court Cause Nos.
20D06-2105-CM-981, 20D06-2105-
CM-982, and 20D06-2105-CM-983

**Opinion by Judge Riley**
Judges Bradford and Weissmann concur.

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellants Freeman Hochstetler (Freeman), Willard Yoder (Yoder), and Joe Hochstetler (Joe), (collectively, Defendants), appeal their convictions for intimidation, a Class A misdemeanor, Ind. Code § 35-45-2-1(a)(1).

We affirm.

## ISSUES

Defendants present this court with three issues, which we restate and reorder as:

(1) Whether the State proved beyond a reasonable doubt that Defendants committed intimidation;

(2) Whether Defendants' convictions are barred by the church autonomy doctrine; and

(3) Whether Defendants waived their arguments that their convictions are subject to strict scrutiny under the Free Exercise Clause and the Indiana Religious Freedom Restoration Act (IRFRA).

## FACTS AND PROCEDURAL HISTORY

The Old Order Amish Church (OOAC) is a religious organization that has members living in several counties in Indiana. The OOAC in Indiana is divided into Districts. In 2016, J.W. and E.W. were members of OOAC District 50 living with at least five of their seven children in LaGrange County. The Indiana Department of Child Services (DCS) first became involved with

the family in December 2016 after it received a report that the father, J.W., was using inappropriate physical discipline in the home.

[5] DCS opened an informal adjustment with the family. E.W. and J.W. worked with Amish support groups as well as DCS during the informal adjustment period. A safety plan prohibiting J.W. from disciplining the children was imposed, but J.W. violated the plan by directing E.W. to discipline the children in the manner he preferred. The DCS informal adjustment ended in the spring of 2017 with the filing of a CHINS petition after J.W. was arrested[1] for battery against one of his children who was four or five years old at the time. In May 2017, E.W. and J.W. separated. DCS instituted a new safety plan for the family. On May 31, 2017, a civil protective order (the protective order)[2] was issued against J.W. in favor of E.W. and five of their minor children who were still living at home.

[6] E.W. believed that to comply with DCS's safety plan, she needed to keep J.W. away from their children and keep the protective order active. DCS employees told E.W. that if she had the protective order rescinded and there were further

---

[1] Records from the CHINS proceedings have been included in the Appellants' Appendix, but, because they were not admitted at trial, we do not consider them. The precise nature of the criminal charge against J.W. is not clear from the record; however, it is clear that J.W. was convicted of a criminal offense as a result of the charge.

[2] There are references in the record to a no-contact order entered as part of J.W.'s criminal case, and, at times, the protective order was referred to at trial as a no-contact order. In our analysis, we refer only to the civil protective order.

instances of abuse in the home, she was at risk of having her children removed from her care. J.W. made no progress during the CHINS proceedings, but the CHINS case was closed at the end of 2017 because DCS felt that E.W. would adequately protect the children's safety. In January 2018, E.W. moved with the children to OOAC's District 70-1, which is in Elkhart County. Initially, although she was not formally made a new member, E.W. was welcomed in District 70-1, and she took communion in the church there.

[7] It is the practice of the members of the OOAC not to involve secular authority or law enforcement in their lives. Although it is unclear from the record whether the members of District 50 were upset about J.W.'s abuse of his family or that E.W. had procured a protective order against J.W. or both, some members of District 50 supported E.W., while others did not. It is also a practice of the OOAC that when there is strife or discord in a District, a panel of three bishops from outside the District is formed to work with the community to resolve whatever issue it is facing. Joe Hochstetler, Freeman Hochstetler, and Daniel Hershberger (Hershberger), who are all bishops in the OOAC, were empaneled in 2017 to work with District 50, a process which began with the bishops discussing the matter with every family in the District.

[8] In August 2018, the two Hochstetlers and Hershberger met with E.W. to pressure her to reconcile with J.W. After this meeting, Hershberger left the panel, and Yoder took his place. In February 2020, the two Hochstetlers and

Yoder—Defendants—and their wives met with E.W. at her home in Elkhart County. E.W. told them she would not remove herself from the protective order because doing so would violate DCS's safety plan and would increase the risk of her children being removed.

[9] Defendants returned to E.W.'s home on June 29, 2020, unannounced and without their wives. Defendants advised E.W. that District 50 had voted the previous day to place her in the *Bann*.[3] Being placed in the *Bann* in the OOAC is a serious consequence to church members and meant that, although E.W. could attend church, she could not take communion or participate in church meetings, she could not serve herself at communal church meals, and her money would not be accepted at Amish stores. When E.W. asked if she had been banned for her refusal to remove herself from the protective order, Freeman nodded his head, while Joe told E.W. that she had "put [her]self into the ban [sic]." (Transcript Vol. II, p. 176). Defendants explained to E.W. that, to have the *Bann* lifted, E.W. would have to remove her name from the protective order. E.W. would also have to go to District 50, make a public confession of fault, and start working with an entirely different support group.

---

[3] "Being in the *Bann*" is how the Amish describe being excommunicated from the church. Erik Wesner, *Shunning*, AMISH AMERICA Blog, https://amishamerica.com/shunning/#bann (last visited July 6, 2023, 4:35 PM). "Shunning" refers to the practice of social exclusion and discipline that follows excommunication of a church member for thwarting church regulations or for committing other transgressions. *Id.*

Although E.W. was open to attempting reconciliation with J.W., she was unwilling to remove herself from the protective order.

[10] About four months later—with E.W. having taken no action to remove herself from the protective order—the local Bishop of the District 70-1 church read a letter from Defendants to the congregation. The letter announced to the congregation that E.W. had been placed in the *Bann* in District 50, in part, for her continued participation in the protective order. The letter specified that the eventual lifting of the *Bann* was conditioned, in part, on E.W.'s removal from the protective order.

[11] On May 28, 2021, the State filed Informations, charging Defendants with Class A misdemeanor intimidation for communicating a threat to E.W. to expose her to "hatred, contempt, disgrace, or ridicule, with the intent that [E.W.] engage in conduct against her will, to wit: petition to remove herself from a protective order[.]" (Amended App. Vol. II, p. 224). Defendants filed an unsuccessful motion to dismiss the charges, arguing that their actions were protected by the First Amendment and the church autonomy doctrine.

[12] During the ensuing bench trial, Defendants argued that their threatened speech—the *Bann*—invoked a matter of public or general concern within the OOAC community. Therefore, Defendants read *Brewington v. State*, 7 N.E.3d 946 (Ind. 2014), as requiring the State to prove actual malice. The State vigorously defended against applying actual malice, arguing:

E.W.'s decision to get a protective order is not and will not be a matter of public concern. It's a private choice, a private exercise to protect her family, to shield her children, based on what DCS communicated to her. Even more generally, Your Honor, a decision to seek a protective order is a fundamentally private act.

(Tr. Vol. III, p. 19). Finding that actual malice did not apply, the trial court convicted Defendants of intimidation.

Defendants now appeal. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

I. *Sufficiency of the Evidence*

A. *Standard of Review*

When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Runnells v. State*, 186 N.E.3d 1181, 1184 (Ind. Ct. App. 2022). We look to the evidence and any resulting reasonable inferences that support the verdict. *Id*. The conviction will be affirmed if there is substantial evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.*

B. *State's Contentions*

We pause to address the State's appellate contentions. At trial, Defendants argued that their speech concerned issues of public or general concern, triggering the requirement that the State prove actual malice. At trial, the State

vigorously defended this position, but on appeal, without explanation, the State reverses course. Now, the State joins Defendants in urging that their convictions must be reversed because the evidence of actual malice is lacking.

[16] We acknowledge that this court has accepted concessions by the State that the evidence does not support a conviction. *See, e.g.*, *Brent v. State*, 957 N.E.2d 648, 652 (Ind. Ct. App. 2011) (reversing based on the State's admission that it had not presented evidence to support an element of the offense of visiting a common nuisance, given that the court was not faced with any other legal issued related to that conviction). However, here, the State attempts to concede its case based on a question of law which is a matter for the courts, not the State, to decide. In addition, we have long held that, even where the State concedes error, it is "nevertheless the duty of this court to examine the record and decide the law as applied to the facts." *Nash v. State*, 433 N.E.2d 807, 810 (Ind. Ct. App. 1982); *see also State v. Torres*, 159 N.E.3d 1018, 1021 (Ind. Ct. App. 2020) (noting that even when the appellee fails to file a brief, this court is still obligated to correctly apply the law to the facts in the record). The State does not present us with any authority indicating that we must accept its concession. Therefore, despite the State's change of stance, we will examine the law and the facts before us to determine whether the evidence supports Defendants' convictions.

## C. *Sufficient Evidence of Intimidation*

[17] The State charged Defendants under Indiana Code section 35-45-2-1(a)(1), which provides that "[a] person who communicates a threat with the intent . . . that another person engage in conduct against the other person's will" commits Class A misdemeanor intimidation. The statute defines "threat" to mean "an expression, by words or action, of an intention to . . . expose the person threatened to hatred, contempt, disgrace, or ridicule." I.C. § 35-45-2-1(c)(6). And "[t]hreats are, by definition, expressions of an intention to do a future thing[.]" *Roar v. State*, 52 N.E.3d 940, 943 (Ind. Ct. App.), *adopted in relevant part, Roar v. State*, 54 N.E.3d 1001, 1002 (Ind. 2016). Indiana's intimidation statute criminalizes the present expression of an intent to expose another person in the future to hatred, contempt, disgrace, or ridicule, with the intent that the other person engages in conduct against her will. A defendant need not carry out the threat to defame the victim to be guilty of intimidation. *See*, *e.g.*, *Gates v. State*, 192 N.E.3d 222, 226-27 (Ind. Ct. App. 2022) (finding evidence of intimidation sufficient when evidence showed the defendant merely intended the victim to believe he would carry out the threat but did not perform the threatened conduct).

[18]     Citing *Brewington,* the parties contend that when threatened speech implicates a matter of public or general concern, the State must prove actual malice.[4] Brewington, a dissatisfied divorce litigant, carried out a persistent and prolonged crusade —including faxes (sometimes multiple per day), repetitive *pro se* motions, and internet posts—accusing the parties' psychologist evaluator and the judge of "unethical" and "criminal" conduct. *Brewington*, 7 N.E.3d at 955-56. Faced with whether proof of actual malice was required for Brewington's intimidation conviction, our Supreme Court found that subpart (c)(6) of the intimidation statute incorporates the classic common-law definition of defamation into Indiana's criminal code. *Id.* at 959. The Court therefore concluded that "[t]he same constitutional free-speech protections that apply in civil defamation cases . . . must also apply to prosecutions under (c)(6)[.]" *Id*. at 959.

[19]     This means that the "actual malice" standard applies to speech about public officials, such that the State may not seek to punish a defamatory statement relating to the conduct of a public official, such as the judge, unless it proves that the statement was made "with 'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Id*. (quoting *New York Times Co. v.*

---

[4] To bring their claim under the auspices of actual malice, the parties insist that the *Bann* is a matter of "public or general concern" within the Amish community. We make no determination as to whether a church congregation of seventy-five people constitutes a community from which we can find an issue of public or general concern.

*Sullivan*, 376 U.S. 254, 279-80 (1964)).  As to the psychologist, the *Brewington* court, "out of an abundance of caution" that actual malice might apply, assumed *arguendo* that the evaluator gave corrupt testimony for personal gratification.  *Id*. at 962.  The Court noted that "[w]e have extended the stringent *New York Times* standard to 'defamation cases involving matters of public or general concern,' even if the victim is a private figure."  *Id.* at 962 (quoting *Journal-Gazette, Co. v. Bandido's, Inc.,* 712 N.E.2d 446, 449, 452 (Ind. 1999)).

[20]   Clinging to the words "matters of public or general concern," the parties argue that the State had to prove actual malice because the *Bann* is a matter of public or general concern within the Amish community.  The parties' reading of *Brewington* is overbroad.  *Brewington* applied actual malice to words Brewington had already published in his internet posts, not to speech not yet uttered.  We do not read *Brewington* as requiring application of the actual malice standard to hypothetical defamation.

[21]   Brewington's years-long campaign against the judge and the psychologist provided the Court with a documented pattern of defamatory speech.  The Court was not forced to rely on conjecture about the content of unuttered defamatory statements.  Reading *Brewington* as the parties do – to require proof of actual malice for possible future public speech – would prove unworkable.

[22] Actual malice requires proof by clear and convincing evidence[5] that the defendant published a defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *Bandido's,* 712 N.E.2d at 456 (quoting *New York Times Co.,* 376 U.S. at 279–80, 84 S. Ct. 71); *see also Taylor v. Antisdel*, 185 N.E.3d 867, 875 (Ind. Ct. App. 2022), *trans. denied*. Actual malice is based on the mindset of the defendant when the defamatory words are communicated, not his intention while contemplating the defamatory act. *See Bandido's*, 712 N.E.2d at 456. In other words, inherent in actual malice is the necessity for speech to be disseminated rather than merely threatened. Defamation cases require a fact-sensitive inquiry involving the nature of the words spoken and the context of their publication. *New York Times Co.*, 376 U.S. at 285. Courts must

> examine for ourselves the statements in issue and the circumstances under which they were made to see * * * whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect. We must 'make an independent examination of the whole record,', so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression.

*Id.* (citations omitted).

---

[5] Arguably, in a criminal intimidation trial, the prosecutor would be put to the "beyond a reasonable doubt" burden of proof.

[23] In the *Bandido's* case, upon which *Brewington* relied, the restaurant sued a newspaper for falsely reporting the establishment had rats. In analyzing actual malice, our Supreme Court reviewed the health department's warning about disclosure, the newspaper's provocative headlines, the performance of the newspaper's reporters in verifying the story, and the speed with which the newspaper published the retraction of the story. *Bandido's*, 712 N.E.2d at 456. After reviewing these relevant facts, the Court concluded the restaurant failed to show actual malice. We question whether the same analysis would have been applied in *Bandido's* had the newspaper editor merely *threatened* the restaurant that it *might* publish an unfavorable story. In that scenario, determining whether the future content of the speech and the context of possible publication would be done with actual knowledge of its falsity or reckless disregard for the truth would be an exercise in conjecture. It is unclear how a prosecutor would prove actual malice for speech threatened but not yet uttered. To the extent the parties seek to extend the actual malice standard from actual defamation to threats of future defamation, we refuse to inject this type of unworkable speculation into the criminal process.

[24] Like the trial court, we confine our review to the facts preceding and surrounding Defendants' threat and do not consider the later alleged defamation. For almost two years, Defendants pressured E.W. to remove herself from the protective order. In August 2018, two of the three defendants,

Joe and Freeman Hochstetler, met with E.W., along with a third bishop, Hershberger, to discuss the protective order and her possible reconciliation with J.W. After this meeting, Hershberger left the panel, and Yoder took his place. Thereafter, Defendants kept working with District 50. The members of District 70-1 also had differing opinions about whether E.W. should be supported and whether she should be allowed to take communion. It was decided that E.W. should remove herself, but not her children, from the protective order so that E.W. and J.W. could meet in person to work with OOAC support towards reconciliation.

[25] In February 2020, Defendants again visited E.W. at her home in Elkhart County. Defendants came with their wives, as E.W. had requested because she felt safer with the women present. Defendants informed E.W. that J.W. was making progress with his behavior, and they asked what progress E.W. had made in removing herself from the protective order. E.W. told Defendants that she was unwilling to remove herself from the protective order because doing so would violate DCS's safety plan and would increase the risk of her children being removed. Defendants resolved that the next step would be to speak with DCS, an action which E.W. felt would resolve the matter. The consequences to E.W. if she refused to remove herself from the protective order were not raised at this meeting.

[26] On June 29, 2020, Defendants returned to E.W.'s home in Elkhart County, this time unannounced and without their wives. E.W. was at home with her younger children, and two of her older children arrived during the meeting. At trial, the State summarized the meeting as:

> These Defendants came rip-roaring into [E.W.'s] home unannounced in June 2020; bullying tactics personified. Three intimidating men confronting a woman and kids in her own home, her own safe space, doing so, while knowing they felt -- that she felt safer if their wives came along.

(Tr. Vol. III, p. 17).

[27] The meeting occurred in the privacy of E.W.'s home and involved a private matter, a protective order. Defendants communicated to E.W. that she was to be placed "into the ban [sic]." (Tr. Vol. II, p. 176). When E.W. asked if she had been banned for her refusal to remove herself from the protective order, Freeman nodded his head, while Joe told E.W. that she had "put [her]self into the ban [sic]." *Id*. Defendants explained to E.W. that to have the *Bann* lifted, E.W. would have to remove her name from the protective order. Given the Defendants' pattern of behavior concerning the protective order, the content of their threat, their choice to utter the threat within the confines of E.W.'s home without the presence of their wives, and Defendants' power and position with the church, the State presented sufficient evidence that Defendants intimidated E.W. on June 29, 2020.

The parties' focus on Defendants' execution of the threat is misplaced. Four months after Defendants threatened to defame E.W. by placing her under the *Bann*, they read the *Bann* in her new district. The four-month delay from the issuance of the threat to the reading of the *Bann* to E.W.'s new congregation reinforces the conclusion that Defendants committed the crime of intimidation on June 29, 2020. Defendants sought to induce action by E.W., and then they waited to see if their threats would bear fruit. Only after months passed without the threat of the *Bann* having the desired effect did the Defendants publish the *Bann* to the congregation. The implementation of the *Bann* is of no moment because the crime of intimidation was complete upon utterance of the threat, not upon its completion.

## II. *Church Autonomy Doctrine*

[29] The First Amendment, which provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[,]" guarantees the right of churches to decide matters concerning faith and doctrine without government intrusion. *Our Lady of Guadelupe Sch. v. Morrissey-Berru*, – U.S. – , 140 S.Ct. 2029, 2060, 207 L.Ed.2d 870 (2020) (quotation omitted). The church autonomy doctrine gives effect to this principle and "deals with a church's First Amendment right to autonomy in making decisions regarding its own internal affairs[,] including matters of faith, doctrine, and internal governance." *Indiana Area Found. of United Methodist Church, Inc. v. Snyder*, 953 N.E.2d 1174, 1178 (Ind. Ct. App. 2011). Despite the

fact that their communications with E.W. concerned in part the topic of her removing herself from the civil protective order, a decidedly non-religious issue which did not implicate OOAC doctrine or decision making, Defendants claim that their actions were shielded by the church autonomy doctrine and that the State's prosecution was an impermissible incursion into "internal church disciplinary and membership decisions, and the communication of those decisions to a member[.]" (Appellants' Br. p. 24).

[30] Defendants cite no cases wherein an Indiana appellate court has reversed a criminal conviction based on the church autonomy doctrine. Indeed, there is limited legal authority in Indiana on the application of the church autonomy doctrine to allegations of criminal activity, but our supreme court has provided some guidance. In *Brazauskas v. Fort Wayne-South Bend Diocese, Inc.*, 796 N.E.2d 286 (Ind. 2003), Brazauskas was denied a position at the University of Notre Dame after the pastor at her former church employer and a bishop at the church's Diocese had truthfully informed Notre Dame that she had sued them after being terminated. *Id*. at 289. Brazauskas sued the Diocese and others for tortious interference with a business relationship and under the blacklisting statute, which made blacklisting a Class C infraction and provided for pursuing penal damages through civil suit. *Id*. Our supreme court affirmed the trial court's dismissal based in part on the Free Exercise Clause and the church autonomy doctrine. *Id*. at 293-94. The *Brazauskas* court noted, however, that the "doctrine does, of course, have limits." *Id*. at 293. The court detailed some of those potential limits within the framework of the facts of the case by noting

that the Free Exercise Clause would not prevent a successful prosecution for conspiracy to commit a felony, even if the agreement involved a church member or official and the agreement implicated ecclesiastical issues. *Id*. at 294 n.6. The court provided the example that the Free Exercise Clause would not shield a defendant charged with conspiracy to commit murder through a terroristic attack who claimed that the agreement to commit the offense was the result of a discussion of church doctrine or policy. *Id*. In concluding that plaintiff's claims were barred, the court observed that "Brazauskas would have us apply the blacklisting statute and tort law to penalize communication and coordination among church officials . . . on a matter of internal church policy and administration *that did not culminate in any illegal act*." *Id*. at 294 (emphasis added). We glean from this discussion and the example provided that our supreme court has recognized that the church autonomy doctrine does not shield those who engage in illegal activity.

[31] This limit on the church autonomy doctrine was recently re-iterated by the Indiana Supreme Court in *Payne-Elliot v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 193 N.E.3d 1009, 1012 (Ind. 2022), another civil employment tort case in which Payne-Elliott filed suit against the Archdiocese after being terminated from his teaching job at a catholic high school for marrying his same-sex spouse. The Archdiocese invoked the defense of the church autonomy doctrine, and the trial court dismissed Payne-Elliot's complaint. *Id*. On transfer from the court of appeals' reversal, our supreme court held that Payne-Elliot's claims were barred by the doctrine. *Id*. at 1013-15. The court re-

iterated its holding in *Brazauskas* that "the church-autonomy doctrine does not provide an automatic per se defense simply because a religious organization invokes it" and that "criminal conduct is not protected by the church-autonomy doctrine—even if carried out using communications about church doctrine or policy." *Id*. at 1014.

[32] As set forth above, sufficient evidence supported Defendants' convictions for Class A misdemeanor intimidation, a criminal offense. *See* I.C. § 35-45-2-1(a)(1). Pursuant to the court's discussions in *Brazauskas* and *Payne-Elliot*, we conclude that Defendants were not shielded from criminal liability for their actions by the First Amendment or the church autonomy doctrine.

[33] In arguing otherwise, Defendants cite *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), in which the Court overturned the convictions of Jehovah's Witnesses who had been distributing literature and soliciting donations, concluding that the statute three of the defendants had been charged under was not content neutral and constituted a prior restraint on the free exercise of their religion. *Id*. at 301-04. The *Cantwell* Court expressly stated, however, that "[n]othing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public. Certainly[,] penal laws are available to punish such conduct." *Id*. at 306. The Court also reversed one of the defendants' conviction pursuant to a vague breach of the peace statute, concluding that simply sharing his religious beliefs on the street was not conduct within the meaning of the common-law offense with which he had been charged. *Id*. at 307-11. Thus, *Cantwell* was not

decided on the grounds that the defendants' convictions interfered with the autonomy of their church, it does not directly support Defendants' argument, and it has not been cited by any Indiana court to overturn a criminal conviction on the basis urged by Defendants.

[34] Defendants also draw our attention to the criminal offense which the *Brazauskas* court indicated would not be shielded by the doctrine, namely conspiracy to commit a murder through a terroristic act, and argue that "the court had in mind crimes involving *more than the mere communicative activity itself*" and that the church autonomy doctrine is only inapplicable when violent crimes are alleged. (Appellants' Br. p. 27) (emphasis in the original). However, absent any further guidance on the subject by our supreme court, we decline to limit its clear directive that "criminal conduct is not protected by the church-autonomy doctrine—even if carried out using communications about church doctrine or policy." *Payne-Elliot*, 193 N.E.3d at 1014. Accordingly, we conclude that Defendants' convictions were not barred by the church autonomy doctrine.

III. *Strict Scrutiny Under the Free Exercise Clause and IRFRA*

[35] As a final challenge to their convictions, Defendants assert that their prosecution for "communicating the ban[] to [E.W.] substantially burdens their exercise of religion and is thus subject to strict scrutiny under the First Amendment and [IRFRA]." (Appellants' Br. p. 41). Although Defendants contend that they "asserted the exercise of their religious beliefs as a defense to the State's prosecution" in the trial court, we have searched the record in vain

for these precise arguments. (Appellants' Br. p. 43). It is well-established that an appellant may not raise issues for the first time on appeal and that failure to raise an issue in the trial court results in waiver of an issue for our consideration. *See Leonard v. State*, 80 N.E.3d 878, 884 n.4 (Ind. 2017) (finding Leonard's constitutional claim raised for the first time on appeal to be waived and observing that declining to review a waived issue is a cardinal principle of sound judicial administration). Accordingly, we conclude that Defendants have waived these claims, and we do not address them.

## CONCLUSION

[36] Based on the foregoing, we hold that the evidence was sufficient to sustain Defendants' convictions for intimidation. We further hold that Defendants' convictions were not barred by the church autonomy doctrine and that they have waived their remaining claims.

[37] Affirmed.

Bradford, J. and Weissman, J. concur